BARON & COMPANY, INC., Plaintiff,

v.

The BANK OF NEW JERSEY, as liquidating trustee of the Garden State Racing Association Liquidating Trust

and

Garden State Racing Association, Defendants.

Civ. A. No. 80–3491.

United States District Court, D. New Jersey.

Jan. 9, 1981.

Manya L. Kamerling, Camden, N. J. and Bruce L. Thall, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for plaintiff.

Steven Kudatzky, Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N. J., for defendants.

## OPINION

GERRY, District Judge.

### FACTS

This diversity action has been transferred to this court from the Eastern District of Pennsylvania. Plaintiff, Baron & Company, Inc., (Baron) is a Pennsylvania corporation which acts as a management consultant specializing in the acquisition, merger and financing of corporations and businesses. In addition, Baron is in the business of acting as a finder of prospective buyers and sellers of businesses.

The defendant, The Bank of New Jersey, is the liquidating trustee of the Garden State Racing Association Liquidating Trust (GSRALT), a trust created under New Jersey law (to liquidate the Garden State Racing Association after the death of major stockholder Eugene V. Mori and fire at the Garden State Race Track). Defendant Garden State Racing Association (GSRA) was a New Jersey corporation whose assets consisted of the Garden State Park Race Track, and the Cherry Hill Lodge and Cherry Hill Inn hotel restaurant facilities. On April 14, 1977, the race track was destroyed by fire. As a result, the directors of GSRA adopted a plan of liquidation, forming GSRALT on April 3, 1978 and naming The Bank of New Jersey as liquidating trustee. GSRA was dissolved, and its assets were transferred to GSRALT, which assumed all contingent liabilities of GSRA.

Sometime in 1976, plaintiff's president, Robert Baron, learned that the Bank was the administrator pendente lite of the Estate of Eugene V. Mori, founder and principal stockholder of GSRA. The primary asset of the estate was Mr. Mori's holdings in the Association. Mr. Baron contacted the Bank to see if he could be of some service to it in connection with the Mori estate. In that conversation and in subsequent conversations with Mr. Richard Weidner, administrator of the estate and president of GSRA from 1977–1978 and liquidating trustee, Mr. Vincent Gentile, a trust officer of the Bank and Eugene E. Mori (son of Eugene V. Mori), the then president of GSRA, Robert Baron requested the opportunity to have his company assist the corporation in selling certain assets, including the Cherry Hill Inn and Cherry Hill Lodge. On April 27, 1977, Baron and GSRA entered into an agreement whereby plaintiff would attempt to secure a ready, willing and able buyer for the Cherry Hill Inn and the Cherry Hill Lodge, for which, if successful, it was to receive a finder's fee. Subsequently, the Lodge was sold independently of the efforts of plaintiff and is not involved in this dispute. Mr. Baron did, however, find a group of buyers for the Inn, who, on November 20, 1978, signed an agreement of sale contingent on whether or not a sale to a group with no relation to Baron could and would be consummated. The sale to the other group was eventually consummated, but plaintiff, claiming that it is nevertheless entitled to its finder's fee, brought this action in federal district court in Pennsylvania.

Defendants, claiming insufficient contacts with Pennsylvania to justify the exercise of in personam jurisdiction over them, brought a motion to dismiss the action or in the alternative to transfer the action to New Jersey District Court. Defendants

also moved to dismiss on the ground that plaintiff lacked capacity to sue by virtue of a door closing statute precluding an action to recover a finder's fee where the plaintiff had failed to obtain a real estate broker's license. On September 23, 1980, Judge Luongo (Eastern District of Pennsylvania) ordered this action transferred to this court; although the court concluded that it lacked personal jurisdiction, it found that it did have the power to transfer and that such a transfer would be in the interest of justice. Because of its disposition of the personal jurisdiction question, the court did not reach defendants' motion to dismiss on substantive grounds. This motion is currently before the court.

Defendants argue that plaintiff is precluded from enforcing its claim for compensation for its services as a "finder" in connection with the sale of the Cherry Hill Inn by reason of the fact the services are covered by the real estate broker laws, which require a license. Plaintiff failed to obtain the requisite license and as a result cannot sue to recover the finder's fee.

Plaintiff opposes dismissal on several grounds. First, plaintiff claims that its services are not subject to the real estate broker licensing laws because it acted only in the capacity of a finder, and, under Pennsylvania law, a finder (as plaintiff defines the term: "one who brings together a buyer and a seller, without more") is entitled to be compensated for his services. Plaintiff contends that the law makes a clear distinction between the activities of a finder and those of a broker. While a license might be required for a broker, it is not required for a finder. In its supplemental brief, plaintiff has argued that the Pennsylvania real estate broker licensing provisions do not apply to its activities, since it was not acting as a broker within Pennsylvania. Since "compensation is sought on the sale of a hotel and adjacent land in New Jersey by a New Jersey corporation ... the Act does not and cannot bar compensation to plaintiff." (Supp. brief at p. 6.) Moreover, even assuming that the Pennsylvania Act applies to a contract entered into in New Jersey for sale of land in New Jersey, plaintiff claims that it is still entitled to recover because it employed a licensed real estate broker "as an independent consultant and he participated in the sale of the Cherry Hill Inn." Finally, plaintiff maintains that it is not precluded from suing for its fee by virtue of the door closing statute, since the "fee is unrelated to the sale of real estate; rather it is for the sale of an ongoing business." (It is interesting to note in this regard that the amount of compensation which plaintiff seeks to recover is not only that portion allocable to the sale of the hotel business; plaintiff's calculation of its fee is based upon the full $4.5 million purchase price covering the business and the land.) Plaintiff further argues that it was not hired to effectuate or assist in the sale of real estate —"Indeed, Baron's fee entitlement is irrelevant to the sale, being conditioned only on finding a ready, willing and able buyer." (Plaintiff's Response to defendants' supplemental memo, p. 2.) Even if the court were to find that plaintiff's activities fall within the statutory provisions, plaintiff states that the activities for which it seeks compensation did not occur in New Jersey and therefore cannot be subject to the New Jersey statute. Plaintiff also argues in its supplemental response to defendants' motion to dismiss that the Pennsylvania Door Closing Act likewise does not apply to its claim: "The Agreement of Sale upon which plaintiff's claim rests was entered into in New Jersey ... the fee agreement itself was approved and entered into in New Jersey." (Id. at p. 8.) In support of this position, plaintiff contends that Judge Luongo, in ruling on the jurisdictional question prior to the transfer of the action to this court, found as a fact that plaintiff's activities all took place in Pennsylvania. As a final matter, plaintiff asserts that even if the New Jersey Act is somehow found applicable, the New Jersey cases do not bar recovery of the fee under the facts of this case.

## DISCUSSION

It has long been held that the capacity of a corporation to sue or be sued in

federal court is determined by the law under which it is organized. *David Lupton's Sons v. Automobile Club of America*, 225 U.S. 489, 32 S.Ct. 711, 56 L.Ed. 1177 (1912); *see also Barling v. Bank of British North America*, 50 F. 260 (9th Cir. 1892). This rule of law has been memorialized in Rule 17(b) of the Federal Rules of Civil Procedure which provides:

(b) Capacity to Sue or Be Sued.

\* \* \* \* \* \*

The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized.

Prior to *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it was also the rule in the federal courts that:

... [T]he state [in which the federal court was sitting] could not prescribe the qualifications of suitors in the courts of the United States, and could not deprive of their privileges those who were entitled under the Constitution and laws of the United States to resort to the federal courts for the enforcement of a valid contract ....

*David Lupton's Sons v. Automobile Club of America*, 225 U.S. at 500, 32 S.Ct. at 714. *Erie* established that, in diversity cases, the right to a remedy in federal district court was dependent upon the availability of the remedy under state law. Thereafter, in *Angel v. Bullington*, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947), the court held that a federal court, sitting in North Carolina, could not grant relief to a foreign suitor in the face of a determination by the North Carolina Supreme Court that North Carolina's no-deficiency statute precluded such relief. Justice Frankfurter, writing for the court, explained:

Cases like *Lupton's Sons v. Automobile Club*, 225 U.S. 489 [32 S.Ct. 711, 56 L.Ed. 1177], are *obsolete* insofar as they are based on a view of diversity jurisdiction which came to an end with *Erie Railroad v. Tompkins*, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188]. That decision drastically limited the power of federal district courts to entertain suits in diversity cases that could not be brought in the respec-

tive state courts or were barred by defenses controlling in the state courts ....

*Id.* at 192, 67 S.Ct. at 662. (Emphasis added.) *Angel* thus stands for the proposition that "[f]or purposes of diversity jurisdiction a federal court is 'in effect only another court of the state.'" *Id.* at 187, 67 S.Ct. at 659; *see also, Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

In *Woods v. Interstate Realty Co.*, 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949), the Supreme Court faced directly the question presented in the instant case—i. e., the right of a foreign corporation which failed to comply with a state registration law, a prerequisite to availing itself of state courts, to bring an action for a broker's commission allegedly due on the sale of real estate within the state. The corporation had filed suit in federal district court, basing jurisdiction on diversity of citizenship. The district court dismissed the suit, relying on the state statutory limitation on the corporation's ability to bring or maintain any action or suit in any courts of the state. The Fifth Circuit reversed, citing *David Lupton's Sons, supra*. The Supreme Court, rejected the Fifth Circuit's reasoning and reversed, reaffirming the rule it stated in *Angel* and holding that where "one is barred from recovery in the state court, he should likewise be barred in the federal court." *Id.* at 538, 69 S.Ct. at 1237.

Although the language of Rule 17(b) defining corporate capacity to sue might appear to state the rule of law of *David Lupton's Sons*, and to continue the validity of its principles, the subsequent decision in *Erie*, rejecting the federal courts' treatment of diversity cases under *Swift v. Tyson*, 16 Pet. 1 (1842), and the post-*Erie* holdings of the Court in *Angel* and *Woods* make it clear that "Rule 17(b) applies only to the capacity of a corporation to sue or be sued in those actions coming to the federal court in the exercise of their jurisdiction in cases excluding diversity of citizenship." *Weinstock v. Sinatra*, 379 F.Supp. 274, 277 (C.D. Calif.1974).

As a federal court sitting in New Jersey, we must look to the law of New Jersey, the forum state, to determine whether such a suit would be permitted in the courts of this state. The prior procedural history of this case—the fact that suit was instituted in the Eastern District of Pennsylvania—is irrelevant to the question of whether the action before this court, a diversity action, is maintained in a court of *this state*. That plaintiff mistakenly brought suit in Pennsylvania (where plaintiff may or may not have had capacity to sue), where the court had no personal jurisdiction over defendants, does not give plaintiff any greater right of access to this court than it would have had had it instituted suit here.

 As we have already indicated, since *Angel* holds that this court is " 'in effect only another court of the State' " in this diversity action, we must consider whether a New Jersey court would permit this action. Although plaintiff is a Pennsylvania corporation and claims to have performed most of its "finding" activities in Pennsylvania, plaintiff has not made out a clear case that a New Jersey court, applying New Jersey choice of laws principles, *see Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), would find Pennsylvania law controlling. New Jersey courts follow the flexible governmental interest approach to choice of laws questions, *Mellk v. Sarahson*, 49 N.J. 226, 229 A.2d 625 (1967), and will apply the law of the jurisdiction having the most significant connection to the transaction involved in the suit. In the instant case, the property to be sold was located in New Jersey, the seller was a New Jersey corporation, the fee agreement which plaintiff asserts as a basis for its entitlement to a finder's fee was executed in New Jersey, and the Agreement of Sale between Marshall & Cohn, the ready, willing and able buyers produced by plaintiff, and GSRALT was entered into and executed in New Jersey. Because of these contacts, because all of these contacts are critical to and determinative of plaintiff's right, and because all these significant contacts took place in New Jersey, we believe a New Jersey court would conclude that the substantive law of New Jersey would govern the question of plaintiff's capacity to sue. Accordingly, we will only consider the New Jersey statutory provisions and case law relevant to the question of plaintiff's capacity and will disregard the parties' arguments concerning the Pennsylvania real estate broker licensing laws and Pennsylvania cases decided thereunder.

The New Jersey statute governing the activities of real estate brokers and salesmen provides:

> No person shall engage either directly or indirectly in the business of a real estate broker or salesman, *temporarily or otherwise*, and no person shall advertise or represent himself as being authorized to act as a real estate broker or salesman, or to engage in any of the activities described in § 45:15–3 of the Revised Statutes, without being licensed so to do as hereinafter provided.

N.J.S.A. 45:15–1. (Emphasis added.) "Engaging in business" is defined to include "any single act, transaction or sale." N.J. S.A. 45:15–2. The statute also contains a broad definition of those activities which would render a person a real estate broker, thus triggering the licensing requirements; N.J.S.A. 45:15–3 provides:

> A real estate broker, for the purposes of this article, is *defined to be a person*, firm or *corporation who*, for a fee, commission or *other valuable* consideration, *or by reason of a promise or reasonable expectation thereof*, lists for sale, sells, exchanges, buys or rents, or offers or attempts to negotiate a sale, exchange, purchase or rental of real estate or an interest therein, or collects or offers or attempts to collect rent for the use of real estate or *solicits for prospective purchasers or assists* or directs *in the procuring of prospects* or the negotiation or closing *of any transaction which does or is contemplated to result in the sale*, exchange, leasing, renting or auctioning of any real estate * * *. (Emphasis added.)

Subsection 3, the definitional section, also contains a "door closing" provision, which provides:

> No person, firm, partnership, association or corporation shall bring or maintain *any action* in the courts of this state for the collection of compensation for the performance of *any of the acts* mentioned in this article without alleging and proving that he was a duly licensed real estate broker at the time the alleged cause of action arose. (Emphasis added.)

■ The first question before us is whether plaintiff's activities were such as to trigger the statutory requirements. Plaintiff argues that they were not. Specifically, plaintiff says: "Although the Bank may have contemplated that it would sell real estate as part of the Cherry Hill Inn, Baron was not hired to effectuate or assist in such a sale.... The contract never mentions that real estate is being sold."

Plaintiff's position is completely without merit. It is not supported by the various agreements between the parties nor by the admissions of plaintiff's president, Mr. Baron. The Fee Agreement indicates Baron was employed as a "finder" to use "its best efforts to find and introduce responsible third party principals to Company [defendants] for the purpose of effecting a sale, purchase or exchange of a business interest." The interest to be sold, as the Fee Schedule indicated, was the Cherry Hill Inn. The agreement apparently involved both the "business" of the Inn and the real estate, since the agreement indicates that plaintiff's fee was based upon the full sales price. This interpretation is borne out by the Consulting Agreement, dated October 12, 1976, in which plaintiff suggested that "[i]n order to obtain a maximum price, with advantageous terms for the sellers, a rationale must be predicated upon impeccable sources that would be used to help determine and verify a given price." One rationale which plaintiff recommended was an "MAI Appraisal of the land and buildings and showing values of adjoining areas." This agreement indicates Baron's understanding that the "sale" for which it was to receive a finder's fee was not merely the sale of a simple commercial interest as plaintiff would now have us believe, but the sale of real property, which included an ongoing commercial interest. An addendum to the Consulting Agreement, dated October 28, 1976, states that plaintiff "will also attempt to sell the Cherry Hill Inn in addition to the Cherry Hill Ramada Inn," and that plaintiff was "to have exclusive agreement to sell both units for a period of six months." A second addendum, dated April 26, 1977, states that the exclusive six-month period was "to begin upon acceptance of the selling documents." The selling documents, at least in plaintiff's contemplation included "an MAI Appraisal of the land and buildings." The documents referred to above, all prepared by plaintiff, plainly reveal plaintiff's understanding that the "interest" to be sold included the land and the buildings. During his deposition, Mr. Baron, plaintiff's principal, stated that the company's task was to find a purchaser for the buildings, land and other assets which comprised the Cherry Hill Inn (Dep. of December 6, 1977 at 105–108).

In light of the evidence in the record of the scope of plaintiff's "finding" activities, we find it absurd that plaintiff could even suggest that it was not hired to assist in the sale of real estate. In addition, as if the evidence of plaintiff's task was not sufficiently discernible from the agreements or the words of plaintiff's principal, plaintiff's understanding of its role is clearly identified in the complaint by virtue of the amount of damages which plaintiff seeks—plaintiff does not only seek recovery for that portion of the sale allocable to the business interest of the Cherry Hill Inn. Plaintiff seeks a fee based upon the entire purchase price, covering the land, the buildings and other assets.

■ We thus find plaintiff's contentions that its activities were not in connection with the sale of real estate without support in the record. We now consider whether plaintiff's activities as a "finder" fall within the scope of the definitional section of § 45:15–3, N.J.S.A. The statutory provi-

sions apply to anyone who "solicits for prospective purchasers or assists or directs in procuring of prospects." In its complaint, plaintiff alleges that, under the fee agreement Baron was to locate/produce a buyer for the Cherry Hill Inn. Plaintiff further alleges that pursuant to various agreements, it contacted various individuals and firms for the purpose of locating a buyer for the Cherry Hill Inn. One of the buyers contacted by plaintiff was David G. Marshall. Plaintiff asserts that on several occasions it brought offers *to defendants* from Mr. Marshall to purchase the Cherry Hill Inn. The allegations in plaintiff's complaint unequivocally establish that plaintiff was soliciting prospective purchasers. Therefore, plaintiff's argument that it did not act as a broker but merely as a finder, and thus is not covered by the statute ignores the broad definitional provision of the New Jersey statute. Regardless of the label plaintiff puts on its activities, plaintiff agreed with defendants to "produce a purchaser to meet the seller's price." (Fee Agreement.) We find that this conduct constitutes solicitation of prospective purchasers within the meaning of N.J.S.A. 45:15–3. Consequently, plaintiff is subject to the licensing requirements of the New Jersey statute.

Plaintiff contends that even if its activities are found to be subject to the New Jersey statute, the provision precluding suit is nevertheless inapplicable because "the activities in which Baron engaged and for which he seeks compensation occurred without the state of New Jersey." Plaintiff attempts to support this position by relying on Judge Luongo's opinion of September 23, 1980. Plaintiff maintains that Judge Luongo found that plaintiff's activities occurred within Pennsylvania. Plaintiff's portrayal of Judge Luongo's opinion constitutes a flagrant mischaracterization of the disposition of the court therein. Nowhere in that opinion did the court make *any findings* with regard to the locus of plaintiff's activities. For purposes of determining whether defendants had sufficient contacts with Pennsylvania, the court assumed that all the *representations* which plaintiff made were true. Even so assuming, even accepting that plaintiff did all the things it said it did in Pennsylvania, Judge Luongo found such activities were unilateral—only the activities of plaintiff, and could not be imputed to defendants for jurisdictional purposes. Such a conclusion does not constitute a *finding* that plaintiff, as a matter of fact, did conduct the activities for which it seeks compensation in Pennsylvania.

■ We have reviewed the papers submitted by plaintiff to Judge Luongo, on which the purported determination that plaintiff's activities took place in Pennsylvania would have been made. As we indicated earlier, Judge Luongo's opinion makes no finding as to the locus of plaintiff's activities. Reviewing the record which plaintiff offered to Judge Luongo in support of its position that the harm to Baron occurred in the Commonwealth of Pennsylvania, we find no support for plaintiff's present assertion in this court that its activities *all* occurred in Pennsylvania. Many of the pages of Mr. Baron's deposition relied on by plaintiff give no indication of the whereabouts of plaintiff when it made certain contacts. In addition, many of the pages cited give no evidence of activity on the part of plaintiff, but merely concern what the Bank had done, or what the Marshall-Cohn group had done. What we have gleaned from the record offered by plaintiff is the following:

1. Plaintiff—through Mr. Baron or an employee—delivered a lot of documents (fee agreement, various consulting agreements) to either Mr. Weidner at the Bank or to the Cherry Hill Inn (Baron dep., December 6, 1979 at 20).

2. Meetings between plaintiff and defendants were held at plaintiff's office, at the Cherry Hill Inn, at the Bank's office in Camden and at the offices of prospective buyers in Camden. (*Id.* at 22, 89.)

3. Mr. Baron took prospective purchasers to the Cherry Hill Inn to inspect the property. (*Id.* at 23.)

4. Mr. Baron took Mr. Cohn to the Cherry Hill Inn. (*Id.* at 158.)

5. During the period between June 1, 1978 and November 20, 1978, plaintiff performed as an intermediary in the negotiations between the Bank and the Marshall-Cohn group.

We do not believe that these facts establish that plaintiff's activities occurred in Pennsylvania. In fact, Mr. Baron's testimony indicates that many significant contacts occurred in New Jersey or by virtue of telephone conversations placed by plaintiff in Pennsylvania to defendants in New Jersey. Thus, plaintiff's acts are not purely extraterritorial as plaintiff now argues before this court.

It is interesting to note that plaintiff, in its supplemental response to defendants' motion to dismiss, filed with the court in the Eastern District of Pennsylvania on September 10, 1980, argued that the Pennsylvania Act requiring a broker's license, 63 P.S. § 446, did not apply to its conduct in this transaction because (1) compensation was sought on the sale of a hotel and adjacent land in New Jersey by a New Jersey corporation; (2) neither the contract nor the conduct of plaintiff respecting the Cherry Hill Inn is controlled by the Pennsylvania statute or case law; (3) the Agreement of Sale upon which plaintiff's claim rests was entered into in New Jersey; and (4) the fee agreement was approved and entered into in New Jersey. There is no factual issue as to these contacts with New Jersey. Because of these significant contacts with New Jersey, plaintiff sought to avoid application of 63 P.S. § 446. Now, plaintiff asserts that "the services for which plaintiff seeks compensation occurred without the state of New Jersey." Plaintiff claims that if this court were to hold the New Jersey statute applicable, it would have to find that "acts of a non-resident *begun and completed* beyond New Jersey are governed by the New Jersey statute." (Emphasis added.) Since plaintiff's activities were neither begun nor completed *beyond* New Jersey, it is not necessary for this court to find that the New Jersey statute has an extraterritorial effect. Plaintiff's

supplemental brief maintains that its activities were begun in New Jersey—Mr. Baron testified that he brought the various agreements between plaintiff and defendants over to New Jersey to be executed; plaintiff argues in its supplemental brief that the fee agreement was entered into in New Jersey. Thus it is clear, and this court finds that plaintiff's acts were begun in New Jersey. We also find that plaintiff's acts— the performance of the duties under the agreement which entitled it to a finder's fee—i. e., the production of a ready, willing and able buyer—were completed in New Jersey. Plaintiff argues that the agreement of sale upon which its claims are based was entered into and executed in New Jersey. Thus, plaintiff's position that the New Jersey statute is inapplicable to its acts because they did not occur in New Jersey is totally without merit. Since we find that plaintiff did engage in substantial activities in New Jersey, and that there is no factual issue as to these activities, we reject the cases cited by plaintiff in support of its position regarding extraterritorial effect. Our determination of the applicability of the New Jersey statute is based upon the existence in the record of evidence that most of the *significant* acts performed by plaintiff occurred in New Jersey or were interstate (telephone conversations), involving both New Jersey and Pennsylvania. Such evidence distinguishes this case from those relied on by plaintiffs. In addition, none of the cases cited by plaintiff in support of its extraterritorial effect argument involved the New Jersey statute. We think that this is an important distinguishing factor. Since the New Jersey statute only requires the performance of a single act, N.J.S.A. 45:15–2, when Mr. Baron took Mr. Cohn to the Cherry Hill Inn to show him the property, admittedly, according to Mr. Baron, for the purpose of soliciting him as a prospective purchaser, that single act in New Jersey under the terms of the statute would have required a license. In *Campbell v. Duncan*, 84 F.Supp. 732 (E.D.Ark.1949), *cited with approval in Tannenbaum v. Sylvan Builders, Inc.*, 29 N.J. 63, 148 A.2d 175

(1959), the court held that arranging for a prospective buyer to inspect the property brings the statutory mandate into operation. Here plaintiff's activities constituted more than merely arranging an inspection. The failure to obtain a New Jersey license (which is uncontroverted) triggers the statutory prohibition of an action to collect plaintiff's fee.

The Third Circuit decision in *C. B. Snyder Realty Co. v. Sherrill-Noonon, Inc.*, 261 F.2d 269 (1958) supports this position. In that case, although the court found the forum state's licensing act inapplicable because plaintiff did not conduct *any* business in the forum (Pennsylvania), the court did state that where the very act for which compensation was sought was the act prohibited by the licensing statute, the door closing provision of such a statute would bar recovery. In the instant case, plaintiff seeks compensation for producing to defendants in New Jersey a ready, willing and able buyer for the land, buildings and other assets of the Cherry Hill Inn located in New Jersey. The New Jersey statute specifically prohibits soliciting prospective purchasers or assisting in the procurement of prospective purchasers for real estate, the very act for which plaintiff seeks compensation, without a license. The court in *C. B. Snyder* exhibited a disposition to apply the door closing statute in cases such as this one.

■ Thus far, we have determined that New Jersey choice of laws would favor application of the New Jersey real estate broker provisions to the facts of this case, that plaintiff's activities were in connection with a sale of real estate, thus triggering the licensing requirements, that plaintiff's activities as a finder constitute activities of a real estate broker again triggering the licensing requirements, and that plaintiff's activities bear sufficient relation to New Jersey to warrant application of the licensing requirements. We must now determine whether a New Jersey court would conclude that this action is not maintainable because of the statutory prohibition on actions for the collection of a fee where no license has been obtained. The New Jersey courts

have held that possession of a real estate license is a precondition to assertion of a claim based upon a brokerage-type contract. *Tannenbaum v. Sylvan Builders, supra; Corson v. Keane*, 4 N.J. 221, 227, 72 A.2d 314 (1950); *Yoerg v. Northern New Jersey Mtg. Assoc.*, 44 N.J.Super. 286, 292, 130 A.2d 392 (App.Div.1957). In *Tannenbaum, supra*, the court stated that:

A foreign contract of that type [brokerage contract] is not enforceable in the forum state if performance thereof, wholly or in material part, consists of acts engaged in in that state contrary to its strong public policy which demands that the actor be licensed as a condition to such activity and to his assertion of a claim thereon.

*Id.* at 73, 148 A.2d 175. In the instant action, we are not dealing with a foreign contract, but a contract entered into in New Jersey. The Pennsylvania choice of laws provision governing interpretation of the agreement does not alter the basic fact that it is a New Jersey contract. Performance of the fee agreement required plaintiff to undertake activity in New Jersey such as the showing of the property and the presentation of a buyer to defendants in New Jersey for which possession of a real estate license was necessary. The fact that plaintiff engaged in such activities without a license contravenes the public policy of New Jersey. Therefore, it is apparent that a New Jersey court would find that this contract and plaintiff's conduct in furtherance thereof violated the licensing statute and would conclude that plaintiff's claim is unenforceable by virtue of the door closing provision of N.J.S.A. 45:15-3.

■ We find plaintiff's argument that enforcement of the door closing provision would not further any purpose of the statute without merit. The statute is, among other things, a regulatory statute and "not merely revenue producing and a contract made in violation of [the provision is] illegal and void." *Saks Theatrical Agency v. Mentine*, 24 N.J.Misc. 332, 333, 48 A.2d 644, 645. The entire tenor and thrust of the Real Estate Brokers Act is that an unlicensed

person *may not act* as a real estate broker or salesman in New Jersey. *Tannenbaum v. Sylvan Builders, Inc.*, 50 N.J.Super. 342, 142 A.2d 247 (1958), *modif. in other respects*, 29 N.J. 63, 148 A.2d 176. The legislative objective in *closing the courts* to an unlicensed broker was to establish a policy so strong that neither a contract nor the unlawful efforts made in its pursuit could provide the basis of pecuniary benefit to such a broker. *Tannenbaum*, 29 N.J. at 71, 148 A.2d 175. Clearly, the legislative objective embodied in the door closing statute and the regulatory purposes of the Act are furthered by denying plaintiff enforcement of its claim in this court. In addition, we believe that a New Jersey court would find itself bound by the policy expressed in *Tannenbaum* and would refuse to permit plaintiff access to a New Jersey court to collect its finder's fee.

■ Despite the strong policy against maintenance of an action such as the instant one and favoring the licensing of those engaging in the activities of a real estate broker, plaintiff would nevertheless have us disregard its failure to procure such a license, and suggests that New Jersey authorities support its position. As we have already indicated, substantial regulatory and legislative objectives are served by a refusal to entertain this suit. In addition, we have determined that plaintiff performed significant acts within New Jersey, triggering the statutory provisions. Only a single act is necessary to trigger the licensing requirements. Plaintiff admits that it did not have a license to engage in the activities of a real estate broker in New Jersey and that it seeks compensation for acts which, we have previously concluded, constitute engaging in the business of real estate broker in New Jersey. N.J.S.A. 45:15–3 creates an absolute bar to maintenance of an action such as this one by an unlicensed broker. "The New Jersey statute does not close only some of the courts in New Jersey or even all of the courts in New Jersey; rather its effect is to void the underlying cause of action." *Weston Funding*

*Corp. v. Lafayette Towers, Inc.*, 550 F.2d 710, 714 (2d Cir. 1977). We conclude that the statutory prohibition bars consideration of the merits of plaintiff's claims and mandates dismissal of this action.

■ Plaintiff's failure to obtain a license is not remedied by its employment of Mr. Danielson, a licensed real estate broker, as an independent consultant. Plaintiff's president, Mr. Baron, admitted that Mr. Danielson was not an employee of plaintiff, but only a part-time consultant. Mr. Baron initially testified that Mr. Danielson was not "involved at all" in plaintiff's dealings with defendants regarding the Cherry Hill Inn (Dep. of December 6, 1979 at 14). During his second deposition, Mr. Baron stated that Mr. Danielson had "some minor involvement" in the Cherry Hill Inn transaction. While plaintiff asserts Mr. Danielson's possession of a license as a basis for satisfying the statute, it does not seek compensation for Danielson's licensed activities but its own unlicensed ones. Danielson is not a party to the complaint, nor is plaintiff asserting any entitlement on his behalf.

In *Tannenbaum, supra*, plaintiff, a New York real estate broker not licensed in New Jersey, who worked with a New Jersey licensed broker in connection with the sale of certain New Jersey realty, argued that because his co-plaintiff was licensed, the action could not be dismissed. The New Jersey Supreme Court rejected this position. The critical fact in its view was that the out of state broker had not obtained a license. To permit maintenance of an action by it on the brokerage contract would violate the strong public policy of N.J.S.A. 45:15–3 and would lend aid to a circumvention of that policy. Accordingly, the court upheld the action of the Appellate Division in denying the out of state plaintiff access to the New Jersey court. Thus, even if Danielson were a party to this action, plaintiff's violation of the statute would not be cured in such a manner as to permit this action.

Plaintiff has urged upon the court at oral argument that *Sullivan v. Hopkins,* 435 F.2d 1128 (9th Cir. 1970), compels a contrary result. Plaintiff has represented to the court that the state statute in that case was "virtually identical" to N.J.S.A. 45:15–3. While the door closing provision of the California law in question in *Sullivan* is virtually identical to subsection (3) of N.J.S.A. 45:15–3, the license provision was not even at issue in that case. The court has examined the statute (Cal.Bus & Prof.Code § 10131.2) that would have been in effect at the time of that decision and has found that it is *not* virtually identical to nor is it as all encompassing as the New Jersey provision. Moreover, we note that the *Sullivan* case deals only with California law and is not instructive in the instant case. Even if the broker licensing provisions were "virtually identical," the New Jersey courts are certainly free to construe their statute as broadly as legislatively intended, and we would have to honor such a construction. As we have found that the New Jersey statute is broader than the provision under consideration in *Sullivan,* wherein California law *expressly omitted* the activities of a finder from the definition of broker, we do not find *Sullivan* in any way controlling.

For all of the foregoing reasons, we conclude that plaintiff's action cannot be maintained in a court of this state, owing to plaintiff's failure to comply with N.J.S.A. 45:15–1 *et seq.*

Counsel for defendants will submit an order consistent with this court's opinion.