731 A.2d 114 (1999)
322 N.J. Super. 452
MARKEIM-CHALMERS, INC., Plaintiff-Respondent,
v.
MASCO CORPORATION and American Shower and Bath Corporation, Defendants-Appellants,
v.
Fred Berlinsky, Third-Party/Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued June 3, 1999.
Decided June 29, 1999.
Gary L. Azorsky, for defendants-appellants (Mesirov, Gelman, Jaffe, Cramer & Jamieson, attorneys; Mr. Azorsky, on the brief).
Henry J. Tyler, Moorestown, for plaintiff-respondents (Brandt, Haughey, Penberthy, Lewis & Hyland, attorneys; Mr. Tyler and Laura M. Danks, on the brief).
Before Judges BAIME, CONLEY and A.A. RODRIÍQUEZ.
The opinion of the court was delivered by *115 CONLEY, J.A.D.
Plaintiff, Markeim-Chalmers, Inc. (MCI), a real estate broker licensed in New Jersey, brought a declaratory judgment action to determine the enforceability of an April 13, 1995 agreement to pay defendant Masco, a "Fortune 100" company, $83,333.33. Plaintiff claims that the agreement was extracted by Masco to obtain a part of plaintiff's real estate commission earned on a lease obtained for one of Masco's subsidiaries, American Shower and Bath. Consequently, plaintiff claims that Masco, which is not a New Jersey licensed broker, cannot enforce the agreement pursuant to the New Jersey Real Estate Licensing Act, N.J.S.A. 45:15-1 to -29.5, and cannot pursue its counter-claim sounding in fraud. Pursuant to Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995), the motion judge concluded that no reasonable juror could conclude other than that the April 13, 1995, agreement reflected Masco's effort to snare part of plaintiff's fee. He viewed this as illegal and, therefore, granted plaintiff's motion for summary judgment and dismissed Masco's counterclaim. Although we think the judge correctly resolved the factual issues under Brill, we are not convinced Masco's conduct constitutes a violation of the New Jersey Real Estate Licensing Act and reverse and remand the matter for further consideration.
To begin with, it is clear that while the letter refers to an agreement by Masco to consider plaintiff "as a final tier competitor" for the listing of another project, that was not the consideration for the $83,333.33 that Masco relied on. Not only was no other broker asked to, or did, pay such a fee to become "a final tier competitor," but, the deposition testimony of Masco's manager of its property management department, Ara Benguian, makes it clear that Masco's claim was that the money was agreed as consideration for a guaranty Masco gave for the underlying lease plaintiff had obtained for Masco's subsidiary, American Shower and Bath (American Shower). But Masco had volunteered that guaranty, it was never made a condition by the landlord, American Shower, or plaintiff during the negotiation for the lease. Furthermore, it is not disputed that Masco received separate compensation for the guaranty in the form of a reduction of the rental. Moreover, the extraction by Benguian came several months after the terms of the lease, including the guaranty, had already been agreed upon, albeit not executed in writing.
But more telling, the extraction occurred almost simultaneous with Benguian's learning of the amount of plaintiff's commission that the landlord had agreed to pay. Benguian acknowledged calling the landlord to find out how much plaintiff was being paid. He acknowledged he was "surprised at the high commission rate," that he thought "it's a lot of money" and that he "continue[s] regularly to pay less than six percent." And he admitted that he used the same payment schedule for the commission fee as a payment schedule for the $83,333.33 "so that they could make adjustments as they got paid." That is to say, so that as plaintiff got paid his fee from the landlord, it could pass part of it onto Masco.
Simply put, Benguian thought the commission fee was too much. In this respect, the following occurred during his deposition:
Q. If [the landlord] was willing to pay [plaintiff] a six percent commission, why did you raise questions about the amount?
A. Because the commission is part of our lease rate. It impacts what it could cost us.
Q. Even though [the landlord] was paying?
A. It's not an altruistic event for [the landlord]. It's part of their cost.
All of this is fully consistent with the landlord's impression that the contact by Benguian over the fee to plaintiff was a "typical" attempt to split the fees. As *116 observed by Richard Cureton, who negotiated the lease for the landlord, "[t]here are a number of corporate clients out in America who take payments from brokers in this manner that he [Benguian] was asking me for, a splitting commissions.... I heard of this concept before and I thought that this call was simply one of those types of situations."[1]
We are convinced the motion judge properly applied Brill to the record before him in casting off as unacceptable by any reasonable juror Masco's efforts to dress the extraction of the $83,333.33 as anything other than an attempt to obtain a share of the fee. We have more difficulty with plaintiff's contention that that effort triggers the preclusive effects of N.J.S.A. 45:15-3.
N.J.S.A. 45:15-3 expressly provides that no person or other entity who is not a licensed broker or salesperson "shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article." (Emphasis added.). Benguian thought $250,000 was too much for plaintiff to get. Masco clearly used its guaranty as a sword to reduce the amount plaintiff would keep for itself. This conduct might be otherwise reprehensible, but is it "obtaining compensation" for acts performed by brokers?
The acts ordinarily performed by brokers and salespersons requiring licensure and referred to in the statute include "assist[ing] or direct[ing] in the ... negotiations or closing of any transaction which does or is contemplated to result in the ... leasing ... of any real estate...." N.J.S.A. 45:15-3.
One might consider Masco's conduct as part of the negotiation process for the lease. And, indeed it was. But N.J.S.A. 45:15-3 closes New Jersey courts to suits by unlicensed persons for monies that are in fact real estate commissions. See generally, Tanenbaum v. Sylvan Builders, Inc., 29 N.J. 63, 148 A.2d 176 (1959); Weston Funding Corp. v. Lafayette Towers, Inc., 550 F.2d 710 (2d Cir.1977); Baron & Co., Inc. v. Bank of New Jersey, 504 F.Supp. 1199 (D.N.J.1981). So strong is the legislative policy reflected by the act that "neither [a] contract nor the unlawful efforts made in its pursuit [can] provide the basis of pecuniary benefit...." Tanenbaum, supra, 29 N.J. at 71, 148 A.2d 176. And see Donadt v. Eberle, 20 N.J. Misc. 349, 353, 27 A.2d 612 (Dist.Ct.1942) ("[t]his brings us to the second question as to whether or not the promissory note given for the compromised sum of $250 constituted a new agreement free from the taint of illegality of the original transaction. This question must be answered in the negative."). See also Rosenthal v. Art Metal, Inc., 95 N.J.Super. 8, 14, 229 A.2d 676 (Law Div.1967), aff'd, 101 N.J.Super. 156, 243 A.2d 828 (App.Div.1968), aff'd, 53 N.J. 344, 250 A.2d 747 (1969).
Application of N.J.S.A. 45:15-3 to the facts here must be considered within the context of the entire scope of the act of which it is a part, N.J.S.A. 45:15-1 to -29.5. The primary objective of that Act is to "protect consumers by excluding `undesirable, unscrupulous and dishonest persons... from the real estate business.'" Atlantic Commercial Group, Inc. v. Dunham, 303 N.J.Super. 122, 129, 696 A.2d 85 (App.Div.1997) (citations omitted). See Baron & Co., Inc. v. Bank of New Jersey, supra, 504 F.Supp. at 1208-09 ("[t]he entire *117 tenor and thrust of the Real Estate Brokers Act is that an unlicensed person may not act as a real estate broker or salesman in New Jersey."). Thus, for example, in Tanenbaum v. Sylvan Builders, Inc., supra, 29 N.J. 63, 148 A.2d 176, a New York licensed real estate broker who had a commission agreement with a New Jersey resident in connection with the sale of New Jersey property could not sue for earned commissions under the agreement because the broker was not licensed in New Jersey. Accord Rosenthal v. Art Metal, Inc., 101 N.J.Super. 156, 161, 243 A.2d 828 (App.Div.1968), aff'd, 53 N.J. 344, 250 A.2d 747 (1969) ("[b]ut the doing of the particular thing, the rendering of services by plaintiff under his contract of employment as a real estate broker, when unlicensed, was itself illegal. One purpose of the statute was to mark off `the business of the broker as distinct from occupations which by general acquiescence are pursued of common right without regulation or restriction,' and to make illegal [only] the acts of the unlicensed in the real estate broker's field." (citations omitted)); Donadt v. Eberle, supra, 20 N.J. Misc. at 353, 27 A.2d 612 ("a public policy has been definitely established in this State to exclude a layman from soliciting and engaging, directly or indirectly, in the sale of real estate.... [T]he statute regulating the licensing of real estate brokers precludes any person other than a licensed broker or salesman from engaging, directly or indirectly, in the business of a real estate broker. Consequently, an unlicensed broker or a layman, cannot profit from any commissions derived from his promotion of a real estate transaction.").
Here, as we have said, a reasonable juror could not conclude other than that Masco wanted part of plaintiff's commission because it thought it was too much money for the deal and used its guaranty to extract the agreement. And to be sure, a broker may voluntarily reduce a real estate commission fee. Golfinopoulos v. Padula, 218 N.J.Super. 38, 42-43, 526 A.2d 1107 (App.Div.), certif. denied, 109 N.J. 45, 532 A.2d 1112 (1987). Beyond that, what happened here may be hard-ball business dealing and/or actionable interference with contractual rights. Indeed, that seems to have been the basis for the motion judge's conclusion that the April 13, 1995 letter agreement was "illegal" and that, therefore, Masco's counterclaim was not sustainable. In this respect, the judge viewed the April 13, 1995 agreement as "a last minute hold-up by Ara of MCI and on an obligation in which they were not involved. It's a little bit of carrying the art of the deal beyond permissible legal limits."
But the basis for plaintiff's motion, and the dismissal of Masco's counterclaim, is plaintiff's contention that the April 13, 1995 letter agreement violates the New Jersey Real Estate Licensing Act. As viewed by the motion judge, the letter agreement represents strong-arming by Masco to reduce the amount of money plaintiff would get from the deal and to put some of that money in its own pocket. And we do not suggest that is the way businesspeople should deal with each other. But what happened here is far different from the broker and the salesperson activities engaged in by the unlicensed plaintiffs in, for example, Tanenbaum v. Sylvan Builders, Inc., supra, 29 N.J. 63, 148 A.2d 176 (arranging for prospective buyer to inspect property), and Baron & Co., Inc. v. Bank of New Jersey, supra, 504 F.Supp. 1199 (finding a prospective purchaser). And, while Masco was involved in the negotiations for the lease, it was doing so not as a broker or salesperson, licensed or not, but as a third-party participant in the deal.
We are inclined to think that the extraction from plaintiff of some of the money it was to receive from the landlord, was not being demanded because Masco had performed real estate brokerage or salesperson services and thus was not violative of N.J.S.A. 45:15-3 and did not constitute a fee-splitting within the meaning of N.J.S.A. 45:15-17(k). If we are correct in *118 that, of course, the summary judgment and dismissal of Masco's counterclaim must be reversed.
However, we sense that the issue potentially has broad implications. Indeed, the landlord's representative viewed the actions of Masco as typical. The motion judge did not focus upon this precise issue and, quite frankly, the parties have not adequately briefed it before us. It is an issue, moreover, that the New Jersey Real Estate Commission may have an interest in. It is not one that should be resolved on the basis of what has been presented to us or on the basis of a trial court decision that did not focus upon it.
Accordingly, while we affirm the motion judge's view of the true nature of the April 13, 1995 letter, we reverse the determination that it is unenforceable under N.J.S.A. 45:15-3 and remand for further consideration. We do not retain jurisdiction.
NOTES
[1] As described by Fred Berlinsky, the MCI broker who negotiated the lease, the April 13, 1995 letter was triggered by a telephone call from Benguian who told him that he had the lease on his desk, that it was fully negotiated and ready to be signed but:

"there was only one thing missing or one problem and that problem was he had recently... found out what [the] commission was going to be ... [and] he wanted half of [the] commission or he would not sign the lease and he would kill the deal."
The commission was $250,000. Benguian initially wanted $125,000. Ultimately American Shower agreed to absorb a third, and Benguian agreed to a third, or $83,333.33.