589 A.2d 143

JOSE VELASQUEZ, PLAINTIFF–APPELLANT, v. VERA FRANZ, INDIVIDUALLY AND AS TRUSTEE OF LEYDEN HYDRAU-LICS, INC.; AND LEYDEN HYDRAULICS, INC., DEFEN-DANTS–RESPONDENTS, AND CRIDGE, INC., AND NEW JER-SEY MANUFACTURERS INSURANCE COMPANY, DEFEN-DANTS.

Argued November 26, 1990—Decided April 25, 1991.

*Waldron Kraemer* argued the cause for appellant (*Kasen, Kraemer, Burns & Lovell,* attorneys).

*Stephen O. Mortenson* argued the cause for respondent (*Mortenson and Pomeroy,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This case presents the question of whether a dismissal in federal court that focuses on a defendant's lack of capacity to be sued constitutes an adjudication on the merits of the claim, thereby barring under principles of *res judicata* a subsequent suit between the same parties, asserting the same claims, based on the same facts in state court. Indeed, the complaint plaintiff filed in the subsequent state action was virtually identical to the complaint plaintiff filed in the prior federal action.

## I

Plaintiff, Jose Velasquez, a New York resident, was employed as a machine operator at Certech, Inc., in Westwood, New Jersey. On November 6, 1984, Velasquez lost most of his right hand while he was operating a molding machine that recycled unexpectedly while his hand was inside, allegedly as a result of defective controls.

Defendant Leyden Hydraulics, Inc. ("Leyden"), an Illinois corporation, manufactured the machine. Leyden had been dissolved under Illinois law on October 25, 1984, just thirteen days before the accident. In liquidation, Leyden's assets were distributed to defendant Vera Franz, the wife of Leyden's principal shareholder. Franz was an Illinois resident.

Velasquez commenced suit in the United States District Court for the District of New Jersey on June 20, 1986, against Leyden and against Franz, individually and as trustee of Leyden. Velasquez alleged, among other claims, that the machine manufactured by Leyden was defective and that Franz, as recipient of the corporate assets, was derivatively liable for any claims. He premised the action on diversity jurisdiction, pursuant to 28 *U.S.C.* § 1332. He also sued Cridge, Inc., the manufacturer of the machine die, and New Jersey Manufacturers Insurance Company, for having negligently inspected the machine. Those claims are not at issue.

Leyden moved to dismiss plaintiff's complaint pursuant to *Federal Rule of Civil Procedure* 12(b)(6) for "failure to state a claim upon which relief can be granted." Specifically, the corporation argued it lacked the capacity to be sued. Leyden maintained that the Illinois Business Corporations Act of 1983, Chapter 32, paragraph 12.80, which bars claims against a corporation accruing subsequent to corporate dissolution, governed plaintiff's suit. Franz joined Leyden's motion to dismiss, asserting that because the corporation could not lawfully be sued, she, as a former shareholder, also lacked the capacity to be sued.

On March 23, 1987, the federal district court dismissed Leyden and Franz from the action. Acknowledging the parties' disagreement on the law that governed their dispute, the court requested that the parties brief the issue, which they did.

In its opinion, the federal district court recognized that

in considering a Rule 12(b)(6) motion to dismiss, I must accept as true the factual allegations of the complaint and I may only dismiss the complaint if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 *U.S.* 41, 45–46 [78 *S.Ct.* 99, 101–102, 2 *L.Ed.*2d 80] (1957); *Cruz v. Beto*, 405 *U.S.* 319 [92 *S.Ct.* 1079, 31 *L.Ed.*2d 263] (1972).

With this standard in mind, I turn to the relevant allegations of the complaint.

After the court set forth the relevant facts, it turned to a discussion of which law governed Leyden's capacity to be sued. Relying primarily on *Federal Rule of Civil Procedure* 17(b), which instructs that "[t]he capacity of a corporation to sue and be sued shall be determined by the law under which it is organized," and recognizing that Leyden was an Illinois corporation, the federal district court found that Illinois law governed Leyden's capacity to be sued. The federal district court then analyzed the Illinois Business Corporations Act of 1983, *supra*, paragraph 12.80, and concluded that

[c]onsistent with its plain language, the [Illinois statute], this section and its predecessor section have been uniformly interpreted to permit the survival of, for the specified period, those causes of action which accrued *prior to the dissolution of the corporation*. For example, in *Blankenship v. Demmler Mfg. Co.*, 89 *Ill.App.*3d 569 [44 Ill.Dec. 787], 411 *N.E.*2d 1153 (1st Dist.1980), the plaintiff in a personal injury action appealed the trial court's dismissal of defendant Demmler Mfg. and its former president.

In affirming the dismissals, the Illinois Appellate Court found that the legislative intent in passing Paragraph 12.80 predecessor was to abrogate the common law doctrine that provided that once a corporation was dissolved, the corporation could neither sue or be sued and all pending proceedings abated.

[89 *Ill.App.*3d at 573, 44 Ill.Dec. at 790, 411 *N.E.*2d at 1156.]

The federal district court then analyzed other Illinois cases that had construed the Illinois corporate law. Based on its analysis of Illinois statutory and case law, the federal district court concluded that claims cannot accrue against an Illinois

corporation subsequent to its dissolution and dismissed the case against Leyden.

The federal district court also dismissed the complaint against Franz. It explicitly declined to decide plaintiff's contention that Illinois courts would impose liability on former shareholders under a trust-fund doctrine. That doctrine renders shareholders who receive distributed assets of the corporation liable as "trustees" for claims of the corporation's creditors. *See Blankenship v. Demmler Mfg. Co., supra,* 89 *Ill.App.*3d at 572, 44 *Ill.Dec.* at 789, 411 *N.E.*2d at 1155. Instead, the federal district court relied on the reasoning of the *Blankenship* court that if the Illinois survival statute barred an action against a corporation for late accrual of the cause of action, the trust-fund doctrine could not reasonably be found to hold an individual shareholder liable. *Id.* at 573–74, 44 *Ill.Dec.* at 790–91, 411 *N.E.*2d at 1156–57. The court found that "even assuming *arguendo* that the doctrine does apply, Franz may still not be held liable, because such liability would be inconsistent with Illinois law providing for the end of a corporate existence." See *id.* at 572, 44 *Ill.Dec.* at 790, 411 *N.E.*2d· at 1156. The federal district court quoted the *Blankenship* court's analysis that to allow a plaintiff to recover on such a theory "would mean that the corporation could never completely dissolve but would live on indefinitely through its shareholders." *Ibid.*

The federal district court did not reach Franz's remaining argument that plaintiff could not properly pierce the corporate veil to hold Franz liable. Apart from the question of whether adequate factual justification existed to disregard the corporate form, the court found that the Illinois corporate dissolution statute precluded plaintiff's claim because the cause of action had arisen after Leyden's dissolution. Consequently, the federal district court granted the motion of defendants Leyden and Franz for dismissal of the claims against them.

Velasquez did not appeal the federal district court decision. Instead, four days later, on March 27, 1987, he filed a complaint

virtually identical to his federal complaint in the New Jersey Superior Court, Law Division. That complaint differed only by a modification of the *ad damnum* clause and the caption style required for state court filings. Defendants Leyden and Franz moved to dismiss the complaint, raising the same "capacity to be sued" arguments that they had raised in federal court. In addition, they argued that the doctrine of *res judicata* barred the complaint.

The New Jersey trial court dismissed the complaint against Leyden and Franz not on the basis of *res judicata* but because it construed New Jersey law to dictate that the law of the incorporating state governs the question of a corporation's capacity to be sued, relying on *Harris–Woodbury Lumber Co. v. Coffin*, 179 *F.* 257 (C.C.N.C.1910) *aff'd*, 187 *F.* 1005 (C.C.A.N. C.1911). Following the federal district court's analysis, the trial court then concluded that Illinois law barred suit against the dissolved corporation and its former shareholder. Plaintiff therefore sought and was granted leave to appeal to the Appellate Division.

The Appellate Division affirmed the trial court's dismissals but based its decision on principles of *res judicata* rather than on the trial court's rationale. After examining federal rules on *res judicata* it found that the federal judgment was an "adjudication on the merits" that barred relitigation of the claims in state court. In accordance with *Federal Rule of Civil Procedure* 41(b), the Appellate Division found that a dismissal pursuant to a motion under *Federal Rule of Civil Procedure* 12(b)(6) for failure to state a claim on which relief could be granted constitutes an adjudication on the merits. The Appellate Division disagreed with plaintiff's contention that the dismissal for failure to state a claim in this case resembled a dismissal for lack of jurisdiction. Because it concluded that the case in state court was barred by *res judicata*, the Appellate Division did not reach the issues of choice of law or former-shareholder liability.

We granted plaintiff's motion for leave to appeal from an interlocutory order of the Appellate Division affirming the dismissal of his complaint against Leyden and Franz, 122 *N.J.* 343, 585 *A.*2d 357 (1990), and now affirm the Appellate Division judgment.

## II

We begin by reviewing well-established principles of *res judicata,* which squarely answer plaintiff's claims.

■ The term *"res judicata"* refers broadly to the common-law doctrine barring relitigation of claims or issues that have already been adjudicated. *Cf. In re Coruzzi,* 95 *N.J.* 557, 568, 472 *A.*2d 546, *appeal dismissed,* 469 *U.S.* 802, 105 *S.Ct.* 56, 83 *L.Ed.*2d 8 (1984) (doctrine of collateral estoppel not mandated by constitution or statute). In essence, the doctrine of *res judicata* provides that a cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding. *Roberts v. Goldner,* 79 *N.J.* 82, 85, 397 *A.*2d 1090 (1979).

The rationale underlying *res judicata* recognizes that fairness to the defendant and sound judicial administration require a definite end to litigation. *Restatement (Second) of Judgments,* § 19 comment a (1982). *See generally* 1B J. Moore, J. Lucas, & J. Currier, *Moore's Federal Practice* ¶ 0.405 (2d Ed.1988) (discussing principles underlying *res judicata* ). The doctrine evolved in response to the specific policy concerns of providing finality and repose for the litigating parties; avoiding the burdens of relitigation for the parties and the court, *ibid.;* and maintaining judicial integrity by minimizing the possibility of inconsistent decisions regarding the same matter. *Id.* at n. 30.

■ For a judicial decision to be accorded *res judicata* effect, it must be a valid and final adjudication on the merits of the claim. *Restatement (Second) of Judgments, supra,* § 27.

When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

[*Ibid.*]

*Accord Federated Dep't Stores, Inc. v. Moitie,* 452 *U.S.* 394, 101 *S.Ct.* 2424, 69 *L.Ed.*2d 103 (1981); *Reed v. Allen,* 286 *U.S.* 191, 52 *S.Ct.* 532, 76 *L.Ed.* 1054 (1931); *Roberts v. Goldner, supra,* 79 *N.J.* at 85, 397 *A.*2d 1090; *Washington Township v. Gould,* 39 *N.J.* 527, 533, 189 *A.*2d 697 (1963); *see also Restatement (Second) of Judgments, supra,* § 19 comment a (only judgment rendered "on the merits" will bar another action on same claim).

■ Typically, the merits of a claim are adjudicated following a full trial of the substantive issues. *Restatement (Second) of Judgments, supra,* § 19; *see Central R.R. v. Neeld,* 26 *N.J.* 172, 177, 139 *A.*2d 110 (doctrine of *res judicata* "ordinarily does not come into play where the parties have not had an adjudication on the ultimate merits"), *cert. denied,* 357 *U.S.* 928, 78 *S.Ct.* 1373, 2 *L.Ed.*2d 1371 (1958). For example, a valid and final personal judgment for defendant does not bar another action by plaintiff on the same claim if the judgment is a dismissal for lack of jurisdiction, improper venue or non-joinder or misjoinder of parties. *Restatement (Second) of Judgments, supra,* § 20(1)(a).

Increasingly, however, statutes, rules and court decisions operate to bar retrial of judgments that do not pass directly on the substance of a claim. *Ibid.* Under the principles of *res judicata* claims that are actually litigated and determined before trial also are barred from being relitigated. *See id.* at § 27 comment d:

d. *When an issue is actually litigated.* When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of this Section. An

issue may be submitted and determined on a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment ... a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict.

■ A judgment of involuntary dismissal or a dismissal with prejudice constitutes an adjudication on the merits "as fully and completely as if the order had been entered after trial." *Gambocz v. Yelencsics*, 468 *F.*2d 837 (3d Cir.1972) (citing *Lawlor v. National Screen Serv. Corp.*, 349 *U.S.* 322, 327, 75 *S.Ct.* 865, 868, 99 *L.Ed.* 1122, 1127 (1955) (dismissal of complaint with prejudice bars subsequent suit on same issue, where operative facts of subsequent suit were identical)).

The federal dismissal at issue here occurred pursuant to a motion under *Federal Rule of Civil Procedure* 12(b)(6) for failure to state a claim on which relief can be granted. Ordinarily, a federal court dismissal that directly determines a right in issue estops relitigation of the same issue in subsequent proceedings between the parties regardless of its form or nature. *Washington Township v. Gould, supra,* 39 *N.J.* at 533, 189 *A.*2d 697 (citations omitted). However, plaintiff contends that because the federal dismissal rested on a determination that defendants lacked the capacity to be sued, the ruling did not reach the merits of the case and should not be accorded preclusive effect under the doctrine of *res judicata.* He urges that the dismissal is like a dismissal for improper venue or lack of diversity, which does not reach the ultimate merits of the controversy or bring *res judicata* into play. We disagree.

■ Under both federal and New Jersey law the district court judgment was an adjudication on the merits. *Federal Rule of Civil Procedure* 41(b) provides in pertinent part:

Unless the court in its order for [involuntary] dismissal otherwise specifies, a dismissal ... other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication on the merits.

Thus, under the federal rules, a motion to dismiss for failure to state a claim is an adjudication on the merits for *res judicata* purposes, unless the judge specifies that it is "without preju-

dice." The Supreme Court has held that a *Federal Rule of Civil Procedure* 12(b)(6) dismissal that occurs before trial for failure to state a claim constitutes a "judgment on the merits." *Federated Dep't. Stores v. Moitie, supra,* 452 *U.S.* at 399 n. 3, 101 *S.Ct.* at 2428 n. 3, 69 *L.Ed.*2d at 109 n. 3; *see also Bell v. Hood,* 327 *U.S.* 678, 682, 66 *S.Ct.* 773, 776, 90 *L.Ed.* 939, 943 (1946) ("for it is well settled that the failure to state a proper cause of action calls for a judgment on the merits"). *See generally* 1B *J. Moore, Federal Practice* ¶ 0.409[1.–2] (2d ed. 1988) (dismissal in federal court pursuant to *Federal Rule of Civil Procedure* 12(b)(6) for failure to state a claim on which relief may be granted bars subsequent action on either federal- or state-law theories).

■ The State rule relating to the finality of dismissals substantially parallels *Federal Rule of Civil Procedure* 41(b), further supporting our conclusion that the federal court dismissal was on the merits. *Rule* 4:37–2(d) provides that

[u]nless the order otherwise specifies, a[n] [involuntary] dismissal ... other than a dismissal for lack of jurisdiction, operates as an adjudication on the merits.

In the tentative draft of the rules by the New Jersey Supreme Court in 1948, the Court commented that the rule "is in the main Federal Civil Rule 41(b) as amended." New Jersey Supreme Court, *Tentative Draft of the Rules Governing the Courts of New Jersey* 180 (1948). Not surprisingly, therefore, a dismissal under *Rule* 4:6–2(e), New Jersey's analogue to *Federal Rule of Civil Procedure* 12(b)(6), has also operated as an adjudication on the merits for *res judicata* purposes. *See, e.g., Printing–Mart–Morristown, Inc. v. Rosenthal,* 650 *F.Supp.* 1444, 1448 n. 7 (D.N.J.1987), *aff'd,* 856 *F.*2d 184 (3d Cir.1988); *Advance Piece Dye Works v. Travelers Indem. Co.,* 64 *N.J.Super.* 405, 166 *A.*2d 173 (App.Div.1969); *cf. Blazer Corp. v. New Jersey Sports and Exposition Auth.,* 199 *N.J.Super.* 107, 488 *A.*2d 1025 (App.Div.1985) (federal court dismissal for failure to state cause of action constituted dismissal on the merits).

The record does not show, and plaintiff does not claim, that the federal judgment rendered on the *Federal Rule of Civil Procedure* 12(b)(6) motion provided that it was not on the merits or that it was without prejudice. The words "without prejudice" generally indicate that "there has been no adjudication on the merits of the claim, and that a subsequent complaint alleging the same cause of action will not be barred simply by reason of its prior dismissal." *Mason v. Nabisco Brands, Inc.,* 233 *N.J.Super.* 263, 267, 558 *A.*2d 851 (App.Div.1989). Without such limiting language, however, a federal judgment operates as an adjudication on the merits under *Federal Rule of Civil Procedure* 41(b) even though it arose under *Federal Rule of Civil Procedure* 12(b)(6). *See Cemer v. Marathon Oil Co.,* 583 *F.*2d 830, 832 (6th Cir.1978) (judgment operates as adjudication on merits under *Federal Rule of Civil Procedure* 41(b) even where dismissal is pursuant to *Federal Rule of Civil Procedure* 12(b)(6)).

Moreover, the federal district court dismissal was not a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party, which are grounds specifically exempted from substantive finality under *Federal Rule of Civil Procedure* 41(b). In *Bell v. Hood, supra,* 327 *U.S.* at 682, 66 *S.Ct.* at 776, 90 *L.Ed.* at 943, the Court distinguished between a dismissal based on lack of jurisdiction and a dismissal based on a failure to state a cause of action:

Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

[citations omitted].

Under *Bell,* the federal district court ruling constituted an adjudication on the merits. The court (1) assumed jurisdiction of the matter; (2) determined as a matter of law, under *Federal Rule of Civil Procedure* 17(b), that the law of Leyden's state of incorporation applied; and (3) decided that under Illinois corpo-

rate law, defendants lacked the capacity to be sued. That *Bell*-type analysis discloses that "the allegations of the complaint [did] not state a ground for relief." *Ibid.*

One of the critical elements plaintiff as well as our dissenting brethren fail to recognize is that the federal district court's dismissal occurred pursuant to Federal Rule *Civil Procedure* 12(b)(6) and not pursuant to *Federal Rule of Civil Procedure* 17(b). Even if we were to accept the argument that the dismissal should be evaluated based on *Federal Rule of Civil Procedure* 17(b) rather than *Federal Rules of Civil Procedure* 12(b)(6) and 41(b), we disagree with the contention that *Federal Rule of Civil Procedure* 17(b) is merely a procedural rule and consequently undeserving of the *res judicata* effect accorded to substantive rules.

The choice-of-law question regarding a corporation's capacity to be sued has been answered by reference to the laws of the state of incorporation since long before the rule's incorporation into the federal rules of civil procedure. *Restatement (Second) of Conflicts of Law* § 299(1) (1971) indicates that local law of the state of incorporation determines whether a corporation's existence has been terminated or suspended. In *Pendleton v. Russell*, 144 *U.S.* 640, 12 *S.Ct.* 743, 36 *L.Ed.* 574 (1891), relied on by the Appellate Division to term the federal district court's decision an adjudication on the merits, the Supreme Court affirmed as invalid a judgment recovered in Tennessee against a company dissolved under a New York decree. The *Pendleton* court emphasized in its judgment that the company in question had no legal existence at the time the claim arose. "[F]or, the corporation having expired, the suit itself had abated. It ceased to be a pending suit." *Id.* at 645, 12 *S.Ct.* at 745, 36 *L.Ed.* at 576. That the Supreme Court turned to the law of the company's state of incorporation to determine the company's existence suggests that that choice of law principle is more than a mere procedural rule, as plaintiff would have us believe. Notably, the Court also stated that "[i]t is well settled that the judgments and decrees of a Circuit Court of the United States

[having jurisdiction] are to be accorded the same effect as would be accorded to the judgments and decrees of a state tribunal of equal authority." *Ibid.*

We agree with the Appellate Division that a dismissal for failure to state a claim on which relief may be granted is distinct from a jurisdictional ruling and represents a decision on the merits of the claim. The federal district court acknowledged that it could only dismiss the complaint "if it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In reaching its conclusion the court reviewed the briefs of the parties, heard argument and rendered an opinion based on the court's examination of the federal and state law. A dismissal for lack of capacity to be sued differs in no respect from any other dismissal for failure to state a claim such that it should not be deemed an adjudication on the merits for *res judicata* purposes.

### III

Although plaintiff could have appealed the federal district court's judgment, he did not. Even where a decision is wrong, as plaintiff contends the federal district court decision is, it is well settled that "a judgement, not set aside on appeal or otherwise, is equally effective as an estoppel upon the points decided." *Reed v. Allen, supra,* 286 *U.S.* at 201, 52 *S.Ct.* at 534, 76 *L.Ed.* at 1058.

Direct appeal exists to correct erroneous judgments. Subsequent state suits cannot displace the proper resort to federal appellate practice. *Federated Dep't. Stores v. Moitie, supra,* 452 *U.S.* at 398–99, 101 *S.Ct.* at 2427–28, 69 *L.Ed.*2d at 109. The Supreme Court noted in *Federated Department Stores* that,

[a]s this Court explained in *Baltimore S.S. Co. v. Phillips,* 274 *U.S.* 316, 325, 47 *S.Ct.* 600, 604, 71 *L.Ed.* 1069, 1074 (1927), an "erroneous conclusion" reached by the court in the first suit does not deprive the defendants in the second action "of their right to rely upon the plea of res judicata [sic].... A judgment

merely voidable because based upon an erroneous view of the law is not open to collateral attack, but can be corrected only by a direct appeal and not by bringing another action upon the same [cause of action]."
[*Id.* at 398, 101 *S.Ct.* at 2428, 69 *L.Ed.*2d at 109; *accord Towers v. Brown,* 732 *F.*2d 345 (3d Cir.1984).]

See *Restatement (Second) of Judgments, supra,* § 71, comment f ("[R]elief on the basis of mistake is not a substitute for an appeal.").

Whether the mistake of law is made at the beginning or end of the original court's analysis is irrelevant. "A judgment will be recognized and enforced in other states even though an *error* of fact or *of law was made* in the proceedings *before judgment,* except [where a court lacks competence to render such judgment]." *Restatement (Second) of Conflicts of Laws, supra,* § 106 (emphasis added). Correcting flawed reasoning is the subject of direct appeals, and collateral attacks which "undercut the decisional process" are prohibited. *Restatement (Second) of Judgments, supra,* § 71, comment e. Mistakes subject to correction on collateral attack "do[ ] not include errors by the court in reaching decision, for example in misinterpreting the legal rule that should be applied in determining liability or damages." *Ibid.*

If the federal court misinterpreted which choice of law rule to use, as plaintiff and the dissent allege, correcting that mistake is not a job for a state court but must be addressed to the third circuit. The dissent fails to address that critical element of the instant case. Instead, the dissent invites us on a long journey winding past principles of *res judicata* and through an alternative choice of law analysis. Plaintiff lost his lawsuit in federal district court. The third circuit of the federal judiciary is the appropriate and established forum of appeal for such suits. Longstanding principles favoring comity and finality prevent us from endorsing the dissent's position that ignores the well-established course of direct appeal to the federal court of appeals. We would not approve a federal court's decision to ignore a judgment of our trial court. We will not embrace the opposite course here.

Plaintiff himself chose to commence the action in a federal forum. To authorize plaintiff's nearly identical application to state court following an unfavorable federal decision would be an endorsement of forum sampling, which this Court and the federal courts disdain. *See, e.g., England v. Louisiana State Bd. of Medical Examiners,* 375 *U.S.* 411, 419, 84 *S.Ct.* 461, 466, 11 *L.Ed.*2d 440, 447 (1964) ("[i]f a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, ... he has elected to forego his right to return to the district court"). As Judge Gibbons commented in his concurring opinion in *Schum v. Bailey,* 578 *F.*2d 493, 505 (3d Cir.1978), "[a]pplying federal law promotes uniformity and prevents forum-shopping. If the results were otherwise, we would witness the ludicrous spectacle of litigants scurrying around in search of the state that provides the best avenue of attack on the federal judgement."

## IV

In conclusion, we emphasize that the claims, the parties and the facts were identical in both the federal and state matters. We also note that the doctrine of *res judicata* arose to respond to cases much like the one before us and that it "serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case." *Federated Dep't Stores v. Moitie, supra,* 452 *U.S.* at 401, 101 *S.Ct.* at 2429, 69 *L.Ed.*2d at 110; *cf. Heiser v. Woodruff,* 327 *U.S.* 726, 733, 66 *S.Ct.* 853, 856, 90 *L.Ed.* 970 (1946) (there is "no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata* ").

Only in extraordinary circumstances has the Court departed from strict deference to *res judicata* principles. Such circumstances exist where the issue is purely one of law that affects a substantial public interest, and the decision would "frustrate totally the essential purpose of a statute" and result in ineq-

uitable administration of the law if not reconsidered. *Plainfield v. Public Serv. Elec. & Gas Co.*, 82 *N.J.* 245, 258–59, 412 *A.*2d 759 (1980). Those narrow criteria permitting an exception to the application of *res judicata* were set forth in a context in which this Court held, despite *res judicata*, that a court in 1980 might readdress the interpretation of a 1898 contract that had been previously adjudicated in 1916 by the Court of Errors and Appeals. No such extraordinary circumstances are present in this case. Because we find that plaintiff's claim is barred by *res judicata*, we do not reach his contention that New Jersey choice of law precepts in tort cases should have been applied instead of Illinois corporate law.

The United States Supreme Court, in the early part of this century, compellingly captured the importance of the doctrine of *res judicata*. See *Reed v. Allen, supra*, 286 *U.S.* at 198–99, 52 *S.Ct.* at 533–34, 76 *L.Ed.* at 1054.

> The predicament in which respondent finds himself is of his own making.... [W]e cannot be expected, for his sole relief, to upset the general and well established doctrine of *res judicata*, conceived in the light of the maxim that the interest of the state requires that there be an end to litigation—a maxim which comports with common sense as well as public policy. And the mischief which would follow the establishment of precedent for so disregarding this salutary doctrine against prolonging strife would be greater than the benefit which would result from relieving some case of individual hardship. [*Ibid.*]

Allowing Velasquez to refile in state court the very claim that was carefully considered and dismissed in federal court would undermine public policies favoring stability, limitation on the duration of litigation of a claim, and conservation of judicial resources. Recognizing the value of those policies, this Court will not signal permission to plaintiffs who lose in federal court without a full trial that they may try again in state court on the theory that state legislative and judicial policies would result in a decision in their favor. See *Federated Dep't Stores v. Moitie, supra*, 452 *U.S.* 394, 101 *S.Ct.* 2424, 69 *L.Ed.*2d 103 (plaintiff's state court claim under antitrust law barred by a prior federal court judgment that dismissed complaint on essentially the same grounds).

Because we find that plaintiff's complaint was adjudicated in federal court on the merits, we will not ignore well-founded principles of *res judicata* and permit an essentially identical complaint to be heard by our state courts. We therefore affirm the judgment of the Appellate Division.

STEIN, J., dissenting.

In this extraordinary case, plaintiff's products-liability claim against a dissolved Illinois corporation was dismissed by a federal court because the injury had occurred twelve days after dissolution and Illinois law bars post-dissolution claims. As explained in more detail hereafter, the federal court should not have applied literally *Rule* 17(b) of the *Federal Rules of Civil Procedure* (Federal Rules), which compelled reference to Illinois law in determining defendant-corporation's capacity to be sued, but should instead have applied New Jersey choice-of-law rules and, in all likelihood, New Jersey substantive law. Had it done so, plaintiff's claim probably would have been allowed to proceed to trial. The majority opinion does not respond to or acknowledge the analysis that demonstrates that the federal court's erroneous application of Illinois law resulted from the misleading terminology of *Rule* 17(b), a circumstance not addressed by counsel for either party in the district court but reflected in numerous federal-court decisions that repudiate that *Rule*'s application to diversity litigation. That the federal court's erroneous dismissal of plaintiff's claim was a result of the court's understandable reliance on the misleading terminology of a rule of federal procedure presents the significant substantive issue raised by this appeal—an issue virtually ignored by the majority opinion: the extent to which principles of *res judicata* permit a court to grant relief from an otherwise final judgment because of significant equitable considerations.

The majority opinion focuses instead on a makeweight issue—whether the district court's dismissal was based on *Rule* 12(b)(6) or *Rule* 17(b). *Ante* at 507, 589 *A*.2d at 149. This opinion makes abundantly clear that the district court relied on

*Rule* 17(b) in deciding to apply Illinois law, and does not contest that the order of dismissal was issued pursuant to *Rule* 12(b)(6). The critical issue is not that artificially posed and resolved by the majority, namely, whether the district court's dismissal was an adjudication on the merits, but is rather whether relief from that judgment of dismissal can be granted by this Court consistent with the significant policy considerations that ordinarily mandate application of *res judicata* as a bar to such relief. That issue can be resolved only by examining the principles of *res judicata* in the specific context of the unique circumstances that prompted the federal court's dismissal of plaintiff's claim. The majority opinion abandons its obligation to undertake that analysis. Instead, it relies on hornbook legal principles that do not illuminate or justify the Court's reluctance to consider the extent to which *res judicata* is susceptible to equitable tempering. In my view, the circumstances giving rise to the district court's judgment dismissing the complaint are sufficiently remarkable to justify denying *res judicata* effect to that judgment. I therefore dissent.

## I.

Among the fundamental principles of the doctrine of *res judicata* is the recognition that a first judgment should not be disregarded "because it was wrong." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4403 (1981) (*Federal Practice*). Accordingly, courts have repeatedly recognized that "[t]he doctrine of *res judicata* does not depend on whether the prior judgment was free from error. Otherwise, judgments would have no finality and the core rationale of the rule of res judicata—repose—would cease to exist." *Mitchell v. National Broadcasting Co.*, 553 F.2d 265, 272 (2d Cir.1977) (citations omitted).

The doctrine of *res judicata* occupies a unique status in our jurisprudence. As the Supreme Court recently observed:

We have stressed that "[the] doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts * * *." [*Federated Dep't Stores v. Moitie*, 452 *U.S.* 394, 401, 101 *S.Ct.* 2424, 2429, 69 *L.Ed.*2d 103, 111 (1981) (quoting *Hart Steel Co. v. Railroad Supply Co.*, 244 *U.S.* 294, 299, 37 *S.Ct.* 506, 508, 61 *L.Ed.* 1148, 1153 (1917)).]

Nevertheless, this Court has recognized that claim preclusion doctrines need not be applied immutably "if there are sufficient countervailing interests," *In re Coruzzi*, 95 *N.J.* 557, 568, 472 *A.*2d 546, *appeal dismissed*, 469 *U.S.* 802, 105 *S.Ct.* 56, 83 *L.Ed.*2d 8 (1984), or if "a new determination is warranted to avoid inequitable administration of the law." *Plainfield v. Public Serv. Elec. & Gas Co.*, 82 *N.J.* 245, 259, 412 *A.*2d 759 (1980). The need for some degree of leeway in the application of *res judicata* has been authoritatively endorsed:

The central problem in finality of judgments is how far the principle of finality is to be qualified. The law of res judicata grapples with this central problem. Its specifications endeavor to state the conditions under which the possibility of failure of civil justice is so substantial as to justify remedial action in the form of relitigation. On the one hand, judgments must in general be accorded finality despite flaws in the processes leading to decision and the unavoidable possibility that the results in some instances were wrong. On the other hand, a judgment in a particular case must be subject to reexamination in the name of substantial justice *if the initial engagement of the merits was inadequate.*

[*Restatement (Second) of Judgments* Introduction at 12 (*Restatement*) (emphasis added).]

Whether "the initial engagement of the merits was inadequate," *ibid.*, is the crux of this appeal, which concerns the correctness of the Appellate Division's ruling dismissing plaintiff's products-liability claim against a dissolved Illinois corporation and its shareholder-transferee on *res judicata* grounds. In the prior action, instituted in the United States District Court for the District of New Jersey, the federal court dismissed plaintiff's claim on the basis that the law of Illinois barred claims against a dissolved corporation that arose after the date of dissolution. But neither the parties nor that court "engaged the merits" of whether Illinois law was to be controlling, the record in federal court suggesting that determination of that

issue had been based on the mutual assumption—an assumption that appears to be clearly erroneous—that the issue of controlling law was definitively resolved by *Rule* 17(b) of the Federal Rules, which provides:

The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized.

On the basis of *Rule* 17(b), the district court applied Illinois law and dismissed the complaint against Leyden Hydraulics, Inc. (Leyden), and its shareholder, Vera Franz (Franz). At oral argument we were informed by plaintiff's counsel that the applicability of Illinois law in the federal courts, based on *Rule* 17(b), appeared to be virtually incontrovertible; hence, no appeal was taken from the district court's ruling. Instead, plaintiff instituted this action in the Law Division.

The parties did not raise, nor did the district court consider, however, a string of federal cases that have ruled categorically that *Rule* 17(b) should not be applied in cases in which the federal court's jurisdiction is based on diversity of citizenship, 28 *U.S.C.A.* § 1332, reasoning that to do so would be inconsistent with the holding in *Erie Railroad Co. v. Tompkins,* 304 *U.S.* 64, 58 *S.Ct.* 817, 82 *L.Ed.* 1188 (1938), that federal courts in diversity cases must follow the substantive law prevailing in the states in which they sit. *See, e.g., Baron & Co. v. Bank of N.J.,* 504 *F.Supp.* 1199 (D.N.J.1981); *Farris v. Sambo's Restaurants, Inc.,* 498 *F.Supp.* 143 (N.D.Tex.1980); *McCollum Aviation, Inc. v. CIM Assocs.,* 438 *F.Supp.* 245 (S.D.Fla.1977); *Weinstock v. Sinatra,* 379 *F.Supp.* 274 (C.D.Cal.1974).

Those cases, together with the most pertinent Supreme Court decisions on analogous issues, *Walker v. Armco Steel Corp.,* 446 *U.S.* 740, 100 *S.Ct.* 1978, 64 *L.Ed.*2d 659 (1980), *Woods v. Interstate Realty Co.,* 337 *U.S.* 535, 69 *S.Ct.* 1235, 93 *L.Ed.* 1524 (1948), and *Angel v. Bullington,* 330 *U.S.* 183, 67 *S.Ct.* 657, 91 *L.Ed.* 832 (1946), decisively establish that the district court, as well as the parties, incorrectly assumed that *Rule* 17(b) determined the choice-of-law issue without addressing the critical question whether this state's choice-of-law principles

would favor application of New Jersey or Illinois law in determining whether Leyden could be sued on a claim arising after dissolution. Hence, we must determine if "the initial engagement of the merits was inadequate," *Restatement, supra,* Introduction at 12, to such an extent that the district court's judgment should not be accorded preclusive effect in this action.

## II.

Plaintiff, Jose Velasquez, a resident of New York, was employed as a machine operator at Certech, Inc., in Westwood, New Jersey. The complaint alleges that on November 6, 1984, Velasquez was operating a molding machine manufactured by Leyden. When plaintiff reached into a die opening, the machine unexpectedly cycled, allegedly due to defective controls. The machine crushed plaintiff's hand, resulting in bone and soft-tissue loss, fractures of bones in his hand and wrist, amputation of his thumb and index finger, and nerve damage.

In June 1986, plaintiff instituted suit in the United States District Court of New Jersey, naming as defendants Leyden, identified as the Illinois corporation that had manufactured the machine; Vera Franz, individually and as trustee of Leyden; Cridge, Inc., a Pennsylvania corporation that had manufactured the die used on the machine; and New Jersey Manufacturers Insurance Company, Certech's workers' compensation carrier, which plaintiff alleged to have inadequately inspected the machinery in operation on Certech's premises. The complaint alleged that Leyden had dissolved on October 25, 1984, twelve days prior to the accident, and that on dissolution Franz became the trustee of Leyden.

Leyden and Franz moved to dismiss the complaint on the ground that Illinois law barred all suits against dissolved corporations for post-dissolution injuries. The district court summarily resolved the choice-of-law issue:

In order to determine whether plaintiff can maintain a cause of action against defendant Leyden, I must determine which law governs defendant's capacity to be sued. Federal Rules of Civil Procedure 17(b) provides that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." *Here there is no dispute that defendant Leyden was organized under the laws of Illinois, therefore, [that] state's law rules defendant's capacity to be sued.*

[Emphasis added.]

Having concluded that *Rule 17(b) mandated application of Illinois law,* the court determined that under Illinois law no cause of action could be maintained against a dissolved corporation for claims arising *after* dissolution, citing *Blakenship v. Demmler Manufacturing Co.,* 89 *Ill.App.*3d 569, 44 *Ill.Dec.* 787, 411 *N.E.*2d 1153 (1980), and *In re Johns–Mansville/Asbestosis Cases,* 516 *F.Supp.* 375 (N.D.Ill.1981). The court observed that although the "result may seem unjust to an injured plaintiff, this is precisely what the unambiguous language of the [Illinois] statute provides." Hence, the court dismissed the claims against Leyden and, reasoning that the claims against Franz as "trustee" were dependent on the cause of action against Leyden, also dismissed the claims against Franz. As noted, plaintiff did not appeal.

In March 1987, plaintiff instituted this action in the Law Division naming the same parties as defendants. Leyden and Franz moved to dismiss the complaint for failure to state a claim and on *res judicata* grounds. The Law Division held that *res judicata* was inapplicable on the basis that the district court's dismissal was procedural and not a determination on the merits. Nevertheless, the trial court dismissed the complaint on the basis that New Jersey's choice-of-law rules would invariably apply the law of a corporation's domicile in determining its amenability to suit, and plaintiff's post-dissolution claims could not be maintained under Illinois law.

The Appellate Division granted plaintiff's motion for leave to appeal and the motion of Leyden and Franz for leave to cross-appeal on the issue of *res judicata.* In an unreported opinion, the Appellate Division affirmed the dismissal of the

complaint against Leyden and Franz, but only on *res judicata* grounds. The Appellate Division rejected the trial court's determination that the federal court's dismissal was not an adjudication on the merits, noting that *Rule* 41(b) of the Federal Rules provides in part:

"[U]nless the court in its order for dismissal otherwise specifies, a dismissal * * * other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party * * * operates as an adjudication on the merits."

The Appellate Division reasoned that the district court's dismissal pursuant to *Rule* 12(b)(6) of the Federal Rules, for failure to' state a claim on which relief can be granted, was an adjudication on the merits and entitled to *res judicata* effect. The court also rejected the Law Division's characterization of *Rule* 17(b) as procedural, concluding instead that "it is a rule of substantive law." The Appellate Division did not address the propriety of the district court's reliance on *Rule* 17(b) in a diversity case, nor did the parties raise the issue. We granted plaintiff's motion for leave to appeal, 122 *N.J.* 343, 585 *A.*2d 357 (1990).

### III.

Prior to *Erie Railroad Co. v. Tompkins, supra,* 304 *U.S.* 64, 58 *S.Ct.* 817, 82 *L.Ed.* 1188 (*Erie*), it was well-settled that a corporation's capacity to sue or be sued in federal court could not be controlled by the law of the forum state, but depended instead on the law of the state of incorporation. *David Lupton's Sons Co. v. Automobile Club of Am.,* 225 *U.S.* 489, 32 *S.Ct.* 711, 56 *L.Ed.* 1177 (1912). One federal court has observed that that "rule of law has been memorialized in Rule 17(b) of the Federal Rules of Civil Procedure." *Baron & Co. v. Bank of N.J., supra,* 504 *F.Supp.* at 1203.

In *David Lupton's Sons Co.,* the Supreme Court rejected the contention that a New York statute denying unqualified foreign corporations access to New York courts could also limit access to the federal courts:

The state [in which the federal court was sitting] could not prescribe the qualifications of suitors in the courts of the United States, and could not deprive of their privileges those who were entitled under the Constitution and laws of the United States to resort to the Federal courts for the enforcement of a valid contract.

[225 *U.S.* at 500, 32 *S.Ct.* at 714, 56 *L.Ed.* at 181–82.]

However, a series of post-*Erie* cases, beginning with *Angel v. Bullington, supra,* 330 *U.S.* 183, 67 *S.Ct.* 657, 91 *L.Ed.* 832, corroborated the principle established by *Erie* that in diversity cases the right to relief in the federal courts depended on the existence of a remedy under state law. Bullington, a seller of land in Virginia, had foreclosed a mortgage given to secure notes tendered as part of the purchase. He attempted to collect the deficiency by suing the buyer, Angel, in the North Carolina state courts, but that state's highest court ruled that the claim was barred by a North Carolina statute prohibiting a foreclosing mortgagee from collecting a deficiency after foreclosure. Without seeking review in the United States Supreme Court, Bullington commenced a new action in federal court and obtained a judgment against Angel. The Supreme Court reversed, holding that the determination by the North Carolina courts barring such relief was controlling, both on *res judicata* grounds and because the federal court's jurisdiction was based on diversity:

What is more important, diversity jurisdiction must follow State law and policy. A federal court in North Carolina, when invoked on grounds of diversity of citizenship, cannot give that which North Carolina has withheld. * * *

Cases like David Lupton's Sons Co. v. Automobile Club, 225 US 489, 56 L ed 1177, 32 S Ct 711, Ann Cas 1914A 699, are obsolete insofar as they are based on a view of diversity jurisdiction which came to an end with Erie R. Co. v. Tompkins, 304 US 64, 82 L ed 1188, 58 S Ct 817, 114 ALR 1487. That decision drastically limited the power of federal district courts to entertain suits in diversity cases that could not be brought in the respective State courts or were barred by defenses controlling in the State courts.

[*Id.* at 192, 67 *S.Ct.* at 662, 91 *L.Ed.* at 838.]

In *Woods v. Interstate Realty Co., supra,* 337 *U.S.* 535, 69 *S.Ct.* 1235, 93 *L.Ed.* 1524, the Supreme Court applied the *Erie* principle to bar a Tennessee corporation's federal-court action against a Mississippi resident to recover a brokerage commis-

sion. The district court had dismissed the action, concluding that under Mississippi law the contract was void because the plaintiff was doing business in Mississippi without complying with that State's qualification requirements for foreign corporations. The Fifth Circuit had reversed, citing *David Lupton's Sons Co.* for the principle that the provisions of Mississippi law did not close the doors of the federal court sitting in that state. The Supreme Court reinstated the district court's judgment of dismissal, emphasizing that the holding in *David Lupton's Sons Co.* had been repudiated, and reiterating that the policy of *Erie* "precluded maintenance in the federal court in diversity cases of suits to which the State had closed its courts." *Id.* 337 *U.S.* at 537, 69 *S.Ct.* at 1236, 93 *L.Ed.* at 1526.

In *Hanna v. Plumer*, 380 *U.S.* 460, 85 *S.Ct.* 1136, 14 *L.Ed.*2d 8 (1965), and *Walker v. Armco Steel Corp., supra,* 446 *U.S.* 740, 100 *S.Ct.* 1978, 64 *L.Ed.*2d 659, the Court endeavored to clarify the application of *Erie* to diversity cases in which the law of the forum state differed from a provision of the Federal Rules. In *Hanna,* an Ohio resident instituted suit in federal court in Massachusetts for damages allegedly caused by a Massachusetts resident who was deceased when the complaint was filed. Service of process, consistent with *Rule* 4(d)(1) of the Federal Rules, was made by leaving the summons and complaint with the wife of the decedent's executor at his residence, although Massachusetts law required personal service on an executor. Reversing the district court's dismissal of the complaint, the Court determined that *Rule* 4(d)(1) relates to the "practice and procedure in the district courts," 380 *U.S.* at 464, 85 *S.Ct.* at 1140, 14 *L.Ed.*2d at 13, and that its application in a diversity case did not "alter[ ] the mode of enforcement of state-created rights in a fashion sufficiently 'substantial' to raise the sort of equal protection problems to which the *Erie* opinion alluded." *Id.* at 469, 85 *S.Ct.* at 1142, 14 *L.Ed.*2d at 16.

Similarly, *Walker* involved a choice between *Rule* 3 of the Federal Rules and Oklahoma law in determining when an action is commenced for the purpose of tolling the Oklahoma statute

of limitations. The plaintiff, an Oklahoma carpenter injured on August 22, 1975, while pounding a nail into a cement wall, sued the nail manufacturer, a foreign corporation, in federal court in Oklahoma. The complaint was filed on August 19, 1977, but service on the defendant was not made until December 1977. Under Oklahoma's two-year statute of limitations, an action was not deemed to be "commenced" until service of the summons on the defendant, whereas *Rule* 3 provides that "[a] civil action is commenced by filing a complaint with the court." Affirming the dismissal of the complaint on the ground that *Rule* 3 was inapplicable, the Court observed that

> [t]here is no indication that the Rule was intended to toll a state statute of limitations, much less that it purported to displace state tolling rules for purposes of state statutes of limitations. In our view, in diversity actions Rule 3 governs the date from which various timing requirements of the federal rules begin to run, but does not affect state statutes of limitations.
>
> In contrast to Rule 3, the Oklahoma statute is a statement of a substantive decision by that State that actual service on, and accordingly actual notice by, the defendant is an integral part of the several policies served by the statute of limitations.
>
> [446 *U.S.* at 750–51, 100 *S.Ct.* at 1985–86, 64 *L.Ed.*2d at 667–68 (citations and footnote omitted).]

A number of federal district courts have specifically addressed apparent conflicts in diversity cases between *Rule* 17(b) of the Federal Rules and state statutes limiting the access of foreign corporations to state courts, the courts generally concluding that *Rule* 17(b) does not apply in diversity cases. In *Baron & Co. v. Bank of N.J., supra,* 504 *F.Supp.* 1199, a Pennsylvania corporation's diversity action to recover a fee on a New Jersey real-estate transaction, instituted in the Pennsylvania federal court, was transferred to the district court in New Jersey. The defendant moved to dismiss the action on the basis of a New Jersey door-closing statute precluding recovery of a finder's fee if the plaintiff was unlicensed as a real-estate broker. The plaintiff asserted, among other arguments, that *Rule* 17(b) of the Federal Rules made Pennsylvania rather than New Jersey law controlling with respect to the plaintiff's capacity to maintain its action in federal court. Judge Gerry rejected

the contention that *Rule* 17(b) applied in diversity cases, concluding that New Jersey law was controlling and that the plaintiff's claim for a fee was barred:

> Although the language of Rule 17(b) defining corporate capacity to sue might appear to state the rule of law of *David Lupton's Sons,* and to continue the validity of its principles, the subsequent decision in *Erie,* rejecting the federal courts' treatment of diversity cases under *Swift v. Tyson,* 16 Pet. 1 (1842), and the post-*Erie* holdings of the Court in *Angel* and *Woods* make it clear that "Rule 17(b) applies only to the capacity of a corporation to sue or be sued in those actions coming to the federal court in the exercise of their jurisdiction in cases *excluding* diversity of citizenship." *Weinstock v. Sinatra,* 379 *F.Supp.* 274, 277 (C.D.Calif.1974).
>
> [504 *F.Supp.* at 1203.]

In *Farris v. Sambo's Restaurants, Inc., supra,* 498 *F.Supp.* 143, the defendant, a California corporation, had been sued in federal court in Texas for damages arising from a lease, and sought leave to file a counterclaim. The plaintiff opposed the filing of the counterclaim on the ground that Texas law barred the defendant's access to Texas courts because of its failure to pay franchise taxes. The defendant contended that its capacity to sue pursuant to *Rule* 17(b) was based on California rather than Texas law. The district court barred the counterclaim, concluding that *Rule* 17(b) did not apply in diversity litigation:

> Although the language of Rule 17(b) has not been altered to reflect the demise of the *Lupton's Sons* doctrine, *Erie* and *Woods* leave no doubt that Rule 17(b) now applies only to the capacity of a corporation to sue or be sued in federal court in cases where subject matter jurisdiction is pitched on grounds other than diversity of citizenship. In diversity cases, Rule 17(b) has been effectively qualified to afford a foreign corporation relief in the federal court only if it has an enforceable remedy in the courts of the state in which the federal court is sitting. "While technically the corporation may have capacity to sue in the federal court pursuant to Rule 17(b) it cannot recover where recovery would not be possible in the state court. Any valid state law closing its courts to a foreign corporation which is not qualified to do business in the state must, therefore, be given effect in the federal courts of such state in a case based solely on diversity or alienage jurisdiction." 3A Moore's Federal Practice ¶ 17.21 at 17–226 (2d ed. 1979). We must look therefore to the laws of Texas and the effect they would have on the ability of Sambo's to raise a defense in its behalf in the instant litigation.
>
> [498 *F.Supp.* at 145–46.]

*McCollum Aviation, Inc. v. Cim Associates, supra,* 438 *F.Supp.* 245, reaches the same conclusion, holding that in a

diversity case the capacity of a foreign corporation, not qualified to do business in Florida, to sue in federal court is to be determined on the basis of Florida law, and not by *Rule* 17(b) of the Federal Rules. *Id.* at 248; *accord Weinstock v. Sinatra, supra,* 379 *F.Supp.* at 277 ("Rule 17(b) applies only to the capacity of a corporation to sue or be sued in those actions coming to the federal courts in the exercise of their jurisdiction *in cases excluding diversity of citizenship.*" (emphasis added)); *Power City Communications, Inc. v. Calaveras Tel. Co.,* 280 *F.Supp.* 808 (E.D.Cal.1968) (in federal diversity action California door-closing statute, and not *Rule* 17(b), determines capacity of foreign corporation to maintain suit); *see also* "Recent Cases—Federal Courts," 82 *Harv.L.Rev.* 708, 712 (1969) (suggesting that "capacity to sue" in *Rule* 17(b) should be narrowly construed to avoid conflict with substantive state-law rules such as door-closing statutes); 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1569 at 496 (1971) (same). *But see Johnson v. Helicopter & Airplane Servs. Corp.,* 404 *F.Supp.* 726 (D.Md.1975) (applying *Rule* 17(b) to determine capacity of dissolved Delaware corporation to be sued in federal court).

The federal cases limiting the application of *Rule* 17(b) in diversity litigation have almost exclusively involved the apparent conflict between a corporation's capacity to sue under its domiciliary law and the bar of state door-closing statutes. The matter before us involves a corporation's capacity to be sued. In either context, it is evident that *Rule* 17(b), read literally, functions as a choice-of-law rule, purporting to direct the federal courts to apply the law of the corporation's state of incorporation to resolve issues concerning its capacity to sue or be sued. So construed, *Rule* 17(b) would appear to conflict with *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 *U.S.* 487, 61 *S.Ct.* 1020, 85 *L.Ed.* 1477 (1941), which held that federal courts in diversity cases must follow the *choice-of-law* rules prevailing in the states in which they sit. See, *e.g.,* P. Bator, D. Meltzer, P. Mishkin & D. Shapiro, *Hart & Wechsler's The*

*Federal Courts and the Federal System* 846 (3d ed. 1988) ("Rule 17(b) of the Federal Rules of Civil Procedure requires that a corporation's capacity to sue be determined by the law of the state of incorporation. This provision may be viewed as a pro tanto modification of Klaxon—as the statement, in other words, of a uniform federal choice-of-law rule on the question of capacity.").

The principles that have impelled federal courts in diversity cases to conclude that *Rule* 17(b) must yield to state door-closing statutes obviously would mandate an analogous result where the forum state's choice-of-law principles dictate that that state's law determines a corporation's capacity to be sued. Hence, we look to New Jersey's choice-of-law principles in considering whether this state's courts would apply Illinois or New Jersey law to determine Leyden's capacity to be sued on a products-liability claim arising after dissolution.

## IV.

More than two decades ago New Jersey rejected the doctrine of *lex loci delicti*, which determined choice of law in tort cases on the basis of where the wrong occurred. *Mellk v. Sarahson,* 49 *N.J.* 226, 228–35, 229 *A.2d* 625 (1967). In its place we adopted the less predictable but more flexible governmental-interest analysis for resolving such choice-of-law questions. See, *e.g., State Farm Mut. Auto. Ins. Co. v. Estate of Simmons,* 84 *N.J.* 28, 34–36, 417 *A.2d* 488 (1980); *Pfau v. Trent Aluminum Co.,* 55 *N.J.* 511, 514–15, 263 *A.2d* 129 (1970). Justice Pollock concisely explained the principles of the governmental-interest analysis in *Veazey v. Doremus,* 103 *N.J.* 244, 510 *A.2d* 1187 (1986):

> Under that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue. *See, e.g., White v. Smith,* 398 *F.Supp.* 130, 134 (D.N.J.1975); *McSwain v. McSwain,* 420 *Pa.* 86, 94, 215 *A.*2d 677, 682 (1966). The first step in the analysis is to determine whether a conflict exists between the law of the interested states. Any such conflict is to be determined on an issue-by-issue basis. *See, e.g., White v. Smith, supra,* 398 *F.Supp.* at 134; R. Leflar, *American Conflicts Law* § 92, at 185 (3rd ed. 1977);

R. Weintraub, *Commentary on the Conflict of Laws* § 6.9, at 285 (2d ed. 1980). If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. *See, e.g., Henry v. Richardson–Merrell, Inc.,* 508 *F.*2d 28, 32 (3rd Cir.1975); *White v. Smith, supra,* 398 *F.Supp.* at 134–35; *Schwartz v. Schwartz,* 103 *Ariz.* 562, 564, 447 *P.*2d 254, 256 (1968); *Pfau v. Trent Aluminum Co., supra,* 55 *N.J.* at 516–23 [263 *A.*2d 129]. If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. *See Pfau v. Trent Aluminum Co., supra,* 55 *N.J.* at 521–22 [263 *A.*2d 129]; *Mellk v. Sarahson, supra,* 49 *N.J.* at 230 [229 *A.*2d 625]. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply. *See Henry v. Richardson–Merrell, Inc., supra,* 508 *F.*2d at 32; *White v. Smith, supra,* 398 *F.Supp.* at 134.

[103 *N.J.* at 248, 510 *A.*2d 1187.]

Before embarking on the governmental-interest analysis described in *Veazey,* it is appropriate to acknowledge defendant's contention that there is no choice-of-law issue in this case, advanced on the basis of decisions holding that questions relating to the internal affairs of a corporation are governed by the law of the state of incorporation. *See, e.g., Gross v. Texas Plastics, Inc.,* 344 *F.Supp.* 564, 566 (D.N.J.1972) ("[W]hen a suit involves the internal affairs of a foreign corporation a state court will usually apply the law of the state of incorporation."). To characterize Leyden's amenability to suit as a legal issue relating merely to a corporation's "internal affairs," however, oversimplifies the interests underlying this litigation. Also implicated are this state's interest in affording New Jersey employees a remedy for injuries caused by defective machinery manufactured by foreign corporations, as well as the interest of this plaintiff, and that of similarly-situated plaintiffs, in recovering damages against foreign corporations for post-dissolution products-liability claims. The dimensions of the issue can be better appreciated by analogy to this Court's decision in *Ramirez v. Amsted Industries,* 86 *N.J.* 332, 431 *A.*2d 811 (1981), involving a products-liability claim asserted against the corporate successor to a dissolved Indiana corporation that manufactured a defective machine.

In *Ramirez,* as in this case, the worker was injured while operating an allegedly-defective machine manufactured by a foreign corporation that had dissolved before the accident occurred. Prior to dissolution the Indiana manufacturer's assets, including machinery, patents, and trade names, had been acquired by another Indiana corporation that continued to use the former's manufacturing plant to produce machines. The contract of sale provided that the purchasing corporation did not assume liability for defective machines manufactured by the predecessor corporation. In the plaintiff's suit against Amsted Industries, the successor in interest to the manufacturer of the machine, Amsted contended that its liability should be determined on the basis of the "form of the acquisition and the language of the agreement between the selling and purchasing corporations." *Id.* at 337, 431 *A.*2d 811. Rejecting the traditional corporate approach to successor liability, and without any reference to Indiana law, this Court adopted the so-called "product line" exception to corporate-successor liability developed by the California Supreme Court in *Ray v. Alad Corp.,* 19 *Cal.*3d 22, 560 *P.*2d 3, 136 *Cal.Rptr.* 574 (1977):

> [A] party [that] acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired.
>
> [*Id.* at 34, 560 *P.*2d at 11, 136 *Cal.Rptr.* at 582.]

In adopting the "product line" approach to successor liability, we emphasized that under New Jersey decisional law, "[s]trict liability for injuries caused by defective products placed into the stream of commerce is 'an enterprise liability,' one that continues so long as the defective product is present on the market." *Ramirez, supra,* 86 *N.J.* at 351, 431 *A.*2d 811 (citation omitted). The Court also observed that "the imposition of successor corporation liability upon Amsted is consistent with the public policy of spreading the risk to society at large for the cost of injuries from defective products." *Id.* at 350, 431 *A.*2d 811.

A number of commentators have emphasized the strong connection between judicial imposition of successor-corporation

liability and the need for statutory modification of non-liability rules for dissolving corporations. See, *e.g.*, Green, *Successor Liability: The Superiority of Statutory Reform to Protect Products Liability Claimants*, 72 *Cornell L.Rev.* 17 (1986); Note, *Recognizing Products Liability Claims at Dissolution: The Compatibility of Corporate and Tort Law Principles*, 87 *Colum.L.Rev.* 1048 (1987); Note, *The Post–Dissolution Products Liability Claim Problem: A Statutory Versus a Judicial Solution*, 38 *Syracuse L. Rev.* 1279 (1987). Professor Green argues that statutory modification of corporate-dissolution laws is preferable to common-law successor-corporation liability:

> The resolution of the successor liability issue initially requires recognition that products liability claimants are creditors of the predecessor corporation who have been precluded from submitting their claims because of state dissolution and liquidation statutes that never contemplated long-tail creditors. The law should not allow corporations to cease operations in a manner that frustrates claims of legitimate creditors. Most corporate creditors are protected either by statutes or contractual provisions bargained for during the existence of the corporate debtor. Long-tail products liability claimants are not afforded statutory protection and are uniquely unable to bargain with the predecessor. Predictably, a number of courts have responded within the common law framework by fashioning liberal successor liability law.
>
> * * * In fairness, much of the tortured reasoning results from systemic constraints on the common law process; the courts can only impose successor liability in a post hoc fashion, which in the short run saddles successors with unanticipated liability that they had no realistic opportunity to pass on to the predecessor during the acquisition process. * * *
>
> An alternative method to ensure that the predecessor bears its products liability burden is to enact a statute limiting the ability of corporations to place their assets beyond the reach of long-tail products claimants. Although such a statute would provide only a prospective solution, it would provide protection for long-tail claimants and give corporations involved in an acquisition the incentive to allocate successor liability in the most efficient fashion. A statute should remove uncertainty, enhance the alienability of ongoing manufacturing businesses, and, at the same time, preserve a viable remedy for the injured claimant.
>
> [Green, *supra*, 72 *Cornell L.Rev.* at 58–59.]

Specifically addressing the inadequacy of liability-limitation provisions of existing state dissolution statutes, the 1984 version of the Revised Model Business Corporation Act makes no distinction between pre- and post-dissolution claims, permitting suit on all claims against dissolved corporations for five years

after publication of notice of dissolution. Revised Model Business Corp. Act § 14.07 (1984). The Official Comment explains the purpose of the new provision:

> Earlier versions of the Model Act did not recognize the serious problem created by possible claims that might arise long after the dissolution process was completed and the corporate assets distributed to shareholders. Most of these claims were based on personal injuries occurring after dissolution but caused by allegedly defective products sold before dissolution * * *.
>
>    *       *       *       *       *       *       *       *
>
>    The solution adopted in section 14.07 is to continue the liability of a dissolved corporation for subsequent claims for a period of five years after it publishes notice of dissolution. It is recognized that a five year cut-off is itself arbitrary, but it is believed that the great bulk of post dissolution claims will arise during this period. This provision is therefore believed to be a reasonable compromise between the competing considerations of providing a remedy to injured plaintiffs and providing a period of repose after which dissolved corporations may distribute remaining assets free of all claims and shareholders may receive them secure in the knowledge that they may not be reclaimed.
>
>    [*Id.* at § 14.07, official comment.]

In determining the existence of a conflict between New Jersey and Illinois law concerning claims against dissolving corporations, this Court's imposition of successor liability in *Ramirez, supra,* 86 *N.J.* 332, 431 *A.*2d 811, must be viewed in the context of the obvious shortcomings of corporate-dissolution statutes that, like the Illinois statute, bar all post-dissolution claims and impose a two-year limit on pre-dissolution claims. Although the issue is novel, other courts confronted with analogous facts have identified the choice-of-law question and applied the law of the forum state because the foreign corporation was engaged in business there. See, *e.g., Dr. Hess & Clark, Inc. v. Metalsalts Corp.,* 119 *F.Supp.* 427 (D.N.J. 1954) (applying New Jersey rather than Illinois law to permit suit filed more than two years after dissolution of Illinois corporation authorized to do business in New Jersey); *North Am. Asbestos Corp. v. Superior Court,* 180 *Cal.App.*3d 902, 225 *Cal.Rptr.* 877 (1986) (applying California rather than Illinois law to permit suit for asbestos-related injuries against dissolved Illinois corporation authorized to do business in California). Hence, if the federal-court judgment in this case were

to be denied preclusive effect, a significant choice-of-law issue unquestionably would confront the trial court.

The governmental-interest analysis explicated in *Veazey, supra,* 103 *N.J.* at 248, 510 *A.*2d 1187, counsels that the "first step in the analysis is to determine whether a conflict exists between the law of the interested states." As noted, Illinois law bars causes of action against a dissolved corporation for claims arising *after* dissolution. *Ill.Ann.Stat.* ch. 32, § 12.80 (Smith–Hurd 1989). In comparison, the New Jersey statutes authorize a dissolved corporation to "give notice requiring all creditors to present their claims in writing," and that notice may allow as little as six months in which to make such presentation. *N.J.S.A.* 14A:12–12(1). The statute bars claims not filed against a dissolved corporation within the prescribed winding-up period. *N.J.S.A.* 14A:12–13. It provides an important exception for creditors who can show "good cause" why their claims were not brought within the allowed time, and allows claimants to pursue their remedies for such claims against any undistributed assets of the corporation and,

> if the undistributed assets are not sufficient to satisfy such a claim, against a shareholder to the extent of his ratable part of such claim, out of the assets of the corporation distributed to him in liquidation or dissolution.
>
> [*Ibid.*]

Although the statutory language does not refer specifically to post-dissolution claims, the Commissioners' Comment to the 1972 Amendments, which created the "good cause" exception to the bar on post-winding-up claims, demonstrates that the Legislature's intention was to create an exception for causes of action arising after the date of dissolution:

> It was the view of the Commission that it is important to compel all creditors who may reasonably be expected to file their claims to do so within the prescribed time and to provide for the barring of the claim upon failure to do so. *On the other hand, the Commission recognized that there will be certain classes of claims which at the time of the notice to creditors might not be known either to the corporation or to the "creditor", such as products liability claims, the cause of action for which might not accrue until several years after the date of the order barring creditors.*

[Commissioners' Comment, *L*.1973, *c.* 366, § 71 (reprinted at *N.J.S.A.* 14A:12–13) (emphasis added).]

Thus, the New Jersey statutes permit the filing of post-dissolution products-liability claims against dissolved corporations without any time limit other than that "good cause" must be shown for claims submitted after the prescribed period, and subject to applicable statute of limitations and discovery-rule restrictions.

In addition, *N.J.S.A.* 14A:13–2(2) provides that

[a] foreign corporation which receives a certificate of authority under this act shall, until a certificate of revocation or of withdrawal is issued * * * be subject to the same duties, restrictions, penalties and liabilities now or hereafter imposed upon a domestic corporation of like character.

Further, *N.J.S.A.* 14A:23–2(3) provides that

[a] foreign corporation which transacts business in this State without a certificate of authority under this act shall be subject to the same duties, restrictions, penalties, and liabilities now or hereafter imposed upon a foreign corporation procuring such certificate of authority.

Hence, a foreign corporation that transacts business without a certificate of authority is subject to the same liabilities as a foreign corporation with such a certificate, and a foreign corporation with a certificate of authority is subject to the same liabilities as a domestic corporation of like character. Accordingly, under New Jersey law, a foreign corporation transacting business in this state, with or without a certificate of authority, would be subject to post-dissolution products-liability claims filed within a reasonable period after the claims accrued. Thus, the first step of the *Veazey* analysis leads to the conclusion that a conflict exists between the laws of the two states.

The governmental-interest analysis described in *Veazey* proceeds next to "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." 103 *N.J.* at 248, 510 *A*.2d 1187. Because the complaint was dismissed before discovery in both the federal court and the Law Division, we cannot discern from this record the extent to which Leyden may have transacted business in this state prior to dissolution

or its method for marketing the molding machine that plaintiff was operating when he was injured. The relevant state-governmental policies, however, appear to be readily identifiable. Illinois' interest lies in regulating the operation of corporations organized under its laws and in maintaining uniform rules applicable to the organization, operation, and dissolution of its domestic corporations. As the Supreme Court once observed:

> How long and upon what terms a state-created corporation may continue to exist is a matter exclusively of state power. The circumstances under which the power shall be exercised and the extent to which it shall be carried are matters of state policy, to be decided by the state legislature.
>
> [*Chicago Title & Trust Co. v. Forty–One Thirty–Six Wilcox Bldg. Corp.*, 302 *U.S.* 120, 127–28, 58 *S.Ct.* 125, 128–29, 82 *L.Ed.* 147, 152 (1937) (citations omitted).]

New Jersey's interest lies in securing adequate compensation for persons injured while residing or working in this state, a policy reflected by its longstanding imposition of strict liability for injuries caused by defective products. See *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150, 169–72, 406 *A.*2d 140 (1979). The principle underlying the strict-liability doctrine was summarized by Justice Francis in *Santor v. A & M Karagheusian, Inc.*, 44 *N.J.* 52, 207 *A.*2d 305 (1965):

> [The doctrine of strict liability in tort] stems from the reality of the relationship between manufacturers of products and the consuming public to whom the products are offered for sale. * * * The obligation of the manufacturer thus becomes what in justice it ought to be—an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries * * * resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves.
>
> [*Id.* at 64–65, 207 *A.*2d 305.]

The question becomes whether this State, having articulated and enforced its interest in securing compensation for persons injured by defective products, is impotent to assert that interest when the out-of-state manufacturer of the offending product, sued in a New Jersey court, filed its dissolution papers before the injury occurred and its state's corporate laws bar the claim. Or put differently, which state's interest is qualitatively domi-

nant for purposes of deciding the choice-of-law question described in *Veazey, supra,* 103 *N.J.* at 248, 510 *A.*2d 1187? I would not decide that issue on this incomplete record, but one could hardly reject out of hand the prospect that on an adequate record New Jersey's interest would readily be perceived as the dominant one.

## V.

In the context of the foregoing choice-of-law analysis, suggesting strongly the possibility that the federal district court or the Law Division would have been required to apply New Jersey law in determining Leyden's amenability to suit, the *res judicata* question becomes critically significant. As explained above, *supra* at 521–527, 589 *A.*2d at 155–158, the district court's conclusion that *Rule* 17(b) mandated the application of Illinois law to determine Leyden's capacity to be sued cannot accurately be characterized as mere legal error. Although the district court's conclusion was clearly erroneous, the error resulted from the court's application of *Rule* 17(b)'s plain language to the facts before it. The federal cases have clearly established that *Rule* 17(b) should not be applied in diversity cases, *supra* at 518, 589 *A.*2d at 153, but the language of the *Rule* does not acknowledge that limitation. Commentators and courts have highlighted that flaw in *Rule* 17(b). See, *e.g.,* Marcus, *Suability of Dissolved Corporations—A Study in Interstate and Federal–State Relationships,* 58 *Harv.L.Rev.* 675, 691–92 (1945) ("The committee [that] drafted [*Rule* 17(b) ] apparently did not intend that the state of incorporation could prevent the corporation from being sued elsewhere, but the language used is not happily phrased. This rule might be compared with the rule that in diversity of citizenship cases the conflict of laws rule of the state of the forum is to be applied in the federal courts."); *Farris v. Sambo's Restaurants, Inc., supra,* 498 *F.Supp.* at 145 ("Although the language of Rule 17(b) has not been altered to reflect the demise of the *Lupton's Sons* doctrine, *Erie* and *Woods* leave no doubt that 17(b) now

applies only to the capacity of a corporation to sue or be sued in federal court in cases where subject matter jurisdiction is pitched on grounds other than diversity of citizenship.")

The question remains, however, whether the fact that the parties and the district court were apparently misled by the imprecise language of *Rule* 17(b) into assuming incorrectly its application in diversity cases is a sufficient basis for this Court to deny *res judicata* effect to the district court's judgment. The answer ultimately depends on the degree of rigidity with which a court approaches *res judicata* and the finality interests underlying its application. In its most recent *res judicata* opinion, the Supreme Court appeared to reject the suggestion that federal *res judicata* doctrine would in any circumstance yield to equitable considerations, no matter how compelling:

> The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case. There is simply "no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of res judicata." *Heiser v. Woodruff,* 327 US 726, 733, 90 L Ed 970, 66 S Ct 853 [856] (1946).
>
> [*Federated Dep't Stores v. Moitie, supra,* 452 *U.S.* at 401, 101 *S.Ct.* at 2429, 69 *L.Ed.*2d at 110.]

Justice Blackmun, concurring in *Moitie,* expressed the more traditional view that the policies underlying *res judicata* may on rare occasions be overshadowed by equitable principles:

> I, for one, would not close the door upon the possibility that there are cases in which the doctrine of res judicata must give way to what the Court of Appeals referred to as "overriding concerns of public policy and simple justice." 611 F2d 1267, 1269 (CA 9 1980). Professor Moore has noted: "Just as res judicata is occasionally qualified by an overriding, competing principle of public policy, so occasionally it needs an equitable tempering." 1B J. Moore & T. Currier, Moore's Federal Practice ¶ 0.405[12], p 791 (1980).
>
> [*Id.* at 402–03, 101 *S.Ct.* at 2429–30, 69 *L.Ed.*2d at 111–12.]

Justice Blackmun's approach to federal *res judicata* traces its roots to the views of the dissenting justices in *Reed v. Allen,* 286 *U.S.* 191, 52 *S.Ct.* 532, 76 *L.Ed.* 1054 (1932), in which the Court's "rigorous application of res judicata * * * to the point of leaving one party in possession [of property] and the other party entitled to the rents," *Moitie, supra,* 452 *U.S.* at 400, 101 *S.Ct.* at 2429, 69 *L.Ed.*2d at 110, generated the following

response by Justice Cardozo, joined by Justices Brandeis and Stone:

> A system of procedure is perverted from its proper function when it multiplies impediments to justice without the warrant of clear necessity. By the judgment about to be rendered, the respondent, caught in a mesh of procedural complexities, is told that there was only one way out of them, and this is a way he failed to follow. Because of that omission he is to be left ensnared in the web, the processes of the law, so it is said, being impotent to set him free. I think the paths to justice are not so few and narrow. A little of the liberality of method that has shaped the law of restitution in the past is still competent to find a way.
>
> [*Reed v. Allen, supra,* 286 *U.S.* at 209–10, 52 *S.Ct.* at 537–38, 76 *L.Ed.* at 1062 (Cardozo, J., dissenting) (citations omitted).]

This pragmatic approach to *res judicata* has been endorsed by Judge Friendly, writing for the Second Circuit in *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 *F.*2d 1265 (1974):

> In this case, even though there was no actual finding in the first suit that Patou's conduct was consistent with trademark ownership, a rigid application of res judicata would confer permanent protection on Patou's trademark maintenance program. * * * Since the doctrine is intended to serve the aims of fairness and efficient judicial administration, it need not be applied mechanically where those ends would not be served. As we have noted on several occasions, res judicata principles, if applied inflexibly, can at times result in unwarranted hardship. *International Railways of Central America v. United Fruit Co.,* 373 F.2d 408, 419 (2 Cir.), cert. denied, 387 U.S. 921, 87 S.Ct. 2035, 18 L.Ed.2d 975 (1967), quoting 1B Moore, Federal Practice ¶ 0.410[2], at 1169 (2d ed. 1965); *Desrosiers v. American Cyanamid Co.,* 377 F.2d 864, 871 (2 Cir.1967). See also *Spilker v. Hankin,* 88 U.S.App.D.C. 206, 188 F.2d 35, 39 (1951); Cleary, Res Judicata Reexamined, 57 Yale L.J. 339, 349–50 (1948); 1B Moore, Federal Practice ¶¶ 0.405[11], [12]. This may be a case in which a rigid application of res judicata is not warranted, even though it falls within the technical reach of the doctrine.
>
> [*Id.* at 1276.]

In *Schum v. Bailey,* 578 *F.*2d 493 (3d Cir.1978), Judge Gibbons' concurring opinion reflects a similarly pragmatic approach to federal *res judicata,* advocating denial of preclusive effect to a prior judgment of dismissal based on allegations that the plaintiff was fraudulently induced to resort to a forum with a less-favorable choice-of-law rule:

> As with all attacks upon final judgments, there is tension between the public interest in favor of finality and the equitable principle that a defrauder should

not enjoy any advantage obtained as a result of his own wrongdoing. We think that under the circumstances presented here that tension must be resolved in favor of Schum and against strict adherence to finality.

[*Id.* at 506.]

Hence, the jurisprudential choice is between an absolutely unyielding and unremitting application of *res judicata* to serve the interests of finality, and an application of that doctrine that is virtually unyielding but nevertheless tolerates an isolated exception in unique circumstances in order to avoid injustice. The argument in favor of the latter approach has been simply stated:

It has been said that res judicata makes black white and crooked straight. In some cases its application produces a demonstrably incorrect result. The principle that litigation must come to an end, however, is a very important one, and the fact that some decisions will be incorrect in a way that can later be demonstrated is a necessary price. Yet there are cases that illustrate that unflagging application of the doctrine sometimes produces harsh and even undesirable results. This is particularly true in cases in which the party is misled into technical error or by changes in the law.

[J. Moore, J. Lucas & T. Currier, 1B *Moore's Federal Practice* ¶ 0.405[12] at 259–60 (2d ed. 1988) (footnotes omitted).]

*England v. Louisiana State Board of Medical Examiners,* 375 *U.S.* 411, 84 *S.Ct.* 461, 11 *L.Ed.*2d 440 (1964), illustrates the unusual circumstances in which the Supreme Court has declined to give *res judicata* effect to a state-court determination on the ground that plaintiffs "mistakenly" believed they were required to assert federal-constitutional issues before the state court. The plaintiffs were chiropractors seeking to enjoin enforcement of the Louisiana Medical Practice Act and to obtain a declaration that the Act, as applied to them, violated the fourteenth amendment. A federal district court abstained pending a determination by the Louisiana state courts on whether the Act applied to the plaintiffs but retained jurisdiction. In the ensuing state-court action, the plaintiffs contended that if the statute applied to them, then it was unconstitutional, reading *Government & Civic Employees Organizing Committee v. Windsor,* 353 *U.S.* 364, 77 *S.Ct.* 838, 1 *L.Ed.*2d 894 (1957), as requiring that they request the state court to construe the statute in the context of the constitutional challenge advanced

in the federal action. A Louisiana appellate court held that the Act applied to the plaintiffs and, as applied, did not violate the fourteenth amendment. The Louisiana Supreme Court denied review, and the plaintiffs did not seek review in the United States Supreme Court. On their return to the federal district court, that court granted the defendant's motion to dismiss on *res judicata* grounds. The Supreme Court agreed with the district court that *res judicata* was technically applicable because the plaintiffs had not reserved their right to litigate the constitutional issue in the federal courts. Nevertheless, the Court reversed the district court's judgment of dismissal:

> On the record in the instant case, the rule we announce today would call for affirmance of the District Court's judgment. But we are unwilling to apply the rule against these appellants. As we have noted, their primary reason for litigating their federal claims in the state courts was assertedly a view that Windsor required them to do so. That view was mistaken, and will not avail other litigants who rely upon it after today's decision. But we cannot say, in the face of the support given the view by respectable authorities, including the court below that appellants were unreasonable in holding it or acting upon it. We therefore hold that the District Court should not have dismissed their action. The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.
>
> [375 *U.S.* at 422–23, 84 *S.Ct.* at 468–69, 11 *L.Ed.*2d at 449 (footnotes omitted).]

This Court has also recognized that under appropriate circumstances the ordinarily-preclusive effect of a prior judgment must yield to a compelling public interest:

> The ability of a court to readdress previously adjudicated issues may under appropriate circumstances be exercised despite the narrow confines of issue preclusion or *res judicata.* This is especially true where, as in this case, the issue is purely one of law and a new determination is warranted to avoid inequitable administration of the law.
>
> [*Plainfield v. Public Serv. Elec. & Gas Co., supra,* 82 *N.J.* at 258–59, 412 *A.*2d 759 (citations omitted).]

Although the general rule is that "[f]ederal law determines the effects under the rules of res judicata of a judgment of a federal court," *Restatement, supra,* § 87, it is acknowledged that in certain cases state law should determine the preclusive effect of a federal judgment:

> [I]f the substantive relationship adjudicated in a federal judgment is governed by state law, the federal courts should adopt state law to determine the effects on others * * *. The underlying distinction parallels, and indeed may correspond to, the distinction drawn between "procedure" and "substance" under * * * the doctrine of *Erie R.R. v. Tompkins* * * *.
>
> [*Id.* at comment b (citations omitted).]

This is clearly a case in which this Court should apply state principles of *res judicata.*

The question we confront is whether the unique factors that led to the district court's dismissal of the complaint override the interests that otherwise would require application of *res judicata.* The *Restatement* acknowledges that no hard and fast rules exist to guide courts in determining when to grant relief from a prior judgment on the merits:

> It is said that the granting of relief is in the "discretion" of the court. This does not mean it is a matter of idiosyncratic choice whether relief is to be granted, for what is required is the exercise of "sound discretion." What is meant is that the decision involves taking account of several incommensurable factors, some relating to the particular case and others to the larger system of administered justice. The factors relating to the particular case include the magnitude and consequences of the judgment, the relative clarity with which it appears that the judgment was unjust, the relative fault of the parties (fraud being different from mistake or change of circumstances), the requirements of diligence * * * and the equities in the interests of reliance. Factors relating to the system of justice are the degree of diligence and competence expected of counsel (since many of the cases involve lapses on their part), the extent to which the court should rely on the adversary presentations in contrast with seeking a just result on its own initiative, the balance to be struck between finality and correctness of judgments, and the distribution of responsibility for deciding upon relief between the trial court and the appellate court. Given this variety of relevant factors, the criteria for granting relief cannot be stated in categorical terms.
>
> [*Restatement, supra,* § 74 comment g.]

The unique features of this case are self-evident. The district court dismissed plaintiff's product-liability claim without acknowledging that a choice-of-law issue was presented, or that *Erie* required the application of New Jersey choice-of-law principles. Thus, the issue that should have been briefed, argued, and decided—whether New Jersey's choice-of-law rules required application of New Jersey or Illinois law in determining Leyden's capacity to be sued—was never litigated, much less

decided. The Court and counsel simply assumed that the issue was preempted by the literal, although imprecise, language of *Rule* 17(b). To deny *res judicata* effect to the district court's judgment would not result in *relitigation* of the choice-of-law issue. Rather, it would permit the issue to be litigated for the first time in this case. *Cf. Desrosiers v. American Cyanamid Co.*, 377 *F.*2d 864, 872 (2d Cir.1967) ("The merits of the plaintiff's grievance were not determined. * * * The defendant was not subjected to the hardship of a full trial nor is it now required to relitigate questions of fact previously tried and determined.").

The *Restatement* notes "the requirements of diligence" as a factor affecting a court's decision to grant relief from a judgment, *Restatement, supra,* § 74 comment g, which arguably implicates plaintiff's failure to appeal from the district court's judgment dismissing the complaint. However, as plaintiff's counsel acknowledged at oral argument, the literal language of *Rule* 17(b) afforded no grounds for appeal. The *Rule* preempted any choice-of-law arguments and mandated application of Illinois law. Unless counsel had been aware of the decisions that repudiated *Rule* 17(b)'s application in diversity cases, an appeal was pointless. In this case, *Rule* 17(b) frustrated litigation of the choice-of-law question at trial and obscured the need to appeal from the district court's erroneous determination that the *Rule* mandated application of Illinois law.

Hence, this is not a case in which the first judgment is to be disregarded merely "because it was wrong." *Federal Practice, supra,* § 4403, at 17. If no more were involved than that, plaintiff's effort to gain compensation for his injuries would have to yield to the overriding interest in finality of judgments. At least three additional factors, beyond the error below, support the grant of relief from the district court's judgment.

First, as noted, the choice-of-law issue was not litigated, either at trial or on appeal, so that reinstatement of the claim would not afford plaintiff a "second bite" at the choice-of-law

apple; plaintiff has yet to bite once. Second, relief from the judgment would vindicate a fundamental principle of federal-diversity litigation violated by the district court's decision: that a litigant pursuing a diversity claim in federal court should not receive different substantive treatment from what would be accorded by the courts of the forum state. Third, relief from the prior judgment would advance the administration of justice by alerting the federal courts to the need for modification of *Rule* 17(b) to avoid injustice to other litigants.

If this Court is empowered to grant relief from *res judicata* in unique circumstances because of compelling equitable considerations and to serve the interests of justice, then it should exercise that power in this case.

I would reverse the judgment of the Appellate Division and remand the matter to the Law Division for further proceedings consistent with this opinion.

Justice O'HERN joins in this opinion.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK and GARIBALDI—4.

*For reversal and remandment* —Justices O'HERN and STEIN—2.